664 F.2d 327
 16 ERC 1777, 12 Envtl. L. Rep. 20,119
 In the Matter of the Complaint of OSWEGO BARGE CORPORATION,
Plaintiff, as Bare Boat Chartered Owner of the Tug "EILEEN
C" and Owner of the Barge "NEPCO 140," for Exoneration from
or Limitation of Liability.
UNITED STATES of America, Claimant-Appellant,
v.
OSWEGO BARGE CORPORATION, Appellee.
 No. 1608, Docket 81-6084.
 United States Court of Appeals,
Second Circuit.
 Argued July 13, 1981.
Decided Oct. 20, 1981.
 
 Thomas W. Snook, Dept. of Justice, Washington, D.C. (Thomas S. Martin, Acting Asst. Atty. Gen., Dept. of Justice, Washington, D.C., George H. Lowe, U. S. Atty. for N.D. New York, Syracuse, N.Y., and Allen van Emmerik, Dept. of Justice, Washington, D.C., on the brief), for claimant-appellant.
 John C. Koster, New York City (Allan A. Baillie, William N. France, and Healy & Baillie, New York City, on the brief), for appellee.
 Before Van GRAAFEILAND and NEWMAN, Circuit Judges, and DUMBAULD,* District Judge.
 NEWMAN, Circuit Judge:
 
 
 1
 In the aftermath of a massive oil spill in the St. Lawrence Seaway, the United States filed claims for cleanup costs against the owner of the discharging vessel. Some of the claims were based on § 311 of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1321 (1976); others were based on traditional maritime law, the federal common law of public nuisance, and § 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 407 (1976) (§ 13 is known as the Refuse Act). The District Court for the Northern District of New York (Howard G. Munson, Chief Judge) dismissed the FWPCA claims without prejudice, and those claims have been refiled in a separate action that is still pending. This appeal is from a judgment dismissing all of the remaining claims on the ground that they are preempted by the provisions of the FWPCA. We affirm the dismissal insofar as the non-FWPCA claims seek recovery of the costs of cleaning up navigable waters of the United States; however, we reverse and remand for further proceedings the claim of the United States for recovery of money reimbursed to Canada for the costs Canada incurred in cleaning up Canadian waters.
 
 
 2
 The oil spill occurred on June 23, 1976, when the Barge "Nepco 140," while being towed by the Tug "Eileen C," grounded in fog in American territorial waters, causing a discharge of oil into the St. Lawrence Seaway. The appellee Oswego Barge Company ("Oswego") owned the barge and had chartered the tug. As a result of the spill, the United States alleges it spent $8,062,981 to clean its territorial waters and reimbursed Canada, pursuant to an executive agreement,[1] for the $768,265 Canada spent to clean Canadian waters.
 
 
 3
 On June 30, 1976, Oswego filed in the Northern District of New York a petition for exoneration from or limitation of liability pursuant to the Limitation of Liability Act of 1851, 46 U.S.C. § 183 (1976) ("Limitation Act"). The District Court ordered all claimants to submit their claims by December 31, 1976. On December 15, 1976, the United States submitted a claim seeking recovery of up to $9,000,000 from Oswego. Invoices were tendered by the Government to Oswego in the total amount of $8,831,246, including $768,265 paid by the United States to Canada. On November 13, 1978, the District Court ruled on Oswego's motion to dismiss the claim presented by the United States.[2] First, the District Court dismissed, without prejudice, the Government's claim to the extent that it was based on § 311 of the FWPCA, because recovery under that statute would not be subject to the Limitation Act Fund.[3] The Government refiled its claim based on the FWPCA in a separate action,[4] United States v. Tug Eileen C, No. 79 CV 117 (N.D.N.Y., filed Feb. 23, 1979), which is still pending. Second, to the extent that the Government's claim for cleanup costs rested on the Refuse Act, the common law of nuisance, or maritime tort law, the District Court ruled that the Government's right to proceed was precluded by the exclusive provisions of the FWPCA. Finally, the Court's ruling permitted the Government to proceed on its claim for recovery on behalf of its citizens for damage to natural resources and wildlife.
 
 
 4
 On October 28, 1980, the Government moved to amend its complaint so as to segregate its claim for its own cleanup expenses from its claim for recoupment of money reimbursed to Canada for Canada's cleanup expenses; the amendment also set out fully the facts (and amounts claimed) pertinent to the "Canadian claim." On April 3, 1981, the District Court denied the United States' motion to amend because of "the prejudice that would befall the petitioner in this action if the amendment were permitted, and the Court's previous ruling on the exclusivity of the Federal Water Pollution Control Act." Meanwhile the parties had settled the claim for damage to natural resources and wildlife. Since the United States did not retain any outstanding claims in the limitation proceeding, the District Court entered judgment against the Government pursuant to Fed.R.Civ.P. 54(b). This appeal followed.
 
 
 5
 On appeal the Government contends that by enacting the FWPCA Congress did not intend to limit the availability of other remedies that would be consistent with the general purpose of the FWPCA to prevent the discharge of oil into United States waters. The Government asserts that the FWPCA was enacted only to insure a minimum recovery of oil pollution cleanup expenses and was not intended to preclude supplementary remedies that would also help prevent oil spills. The Government also argues that the District Court erred in not permitting its complaint to be amended with regard to the "Canadian claim," which it contends is clearly not precluded by the FWPCA. Oswego responds that permitting the Government to seek supplementary remedies would undermine and conflict with the carefully balanced and comprehensive remedial scheme established by Congress in § 311 of the FWPCA. As for the "Canadian claim," Oswego contends that amendment of the complaint was properly denied because of the prejudice that it would otherwise suffer, and that, in any event, the claim is time-barred and precluded by the exclusive provisions of the FWPCA.
 
 
 6
 1. The Claim for Cleanup of United States Waters
 
 
 7
 To determine whether the Government is limited to FWPCA remedies in its claim against Oswego for costs of cleaning up pollution of United States waters requires some understanding of the background against which Congress enacted § 311. Before 1970, the Government's statutory remedy for recovery of its cleanup costs was the Oil Pollution Act of 1924, 43 Stat. 604, as amended by Act of Nov. 3, 1966, Pub.L. No. 89-753, § 211(a), 80 Stat. 1246-1252. Recovery was available only upon proof of gross negligence or willfulness on the part of the discharging vessel. Non-statutory remedies required proof of the elements of a public nuisance[5] or a maritime tort,[6] and any non-statutory recovery would be limited by the Limitation Act to the value of the vessel after the accident unless the act causing the spill was within the privity or knowledge of the vessel owner.[7] See generally Note, Oil Spills and Cleanup Bills: Federal Recovery of Oil Spill Cleanup Costs, 93 Harv.L.Rev. 1761, 1763 (1980) (hereafter "Note, Oil Spills ").
 
 
 8
 Recognizing the inadequacy of these remedies, Congress included a detailed scheme for recovery by the United States of oil spill cleanup costs in § 102 of the Water Quality Improvement Act of 1970, Pub.L. No. 91-224, 84 Stat. 91 (formerly codified at 33 U.S.C. § 1161 (1970)), a statute designed to remedy several deficiencies in the Nation's then-existing water pollution laws. Two years later, in the course of a comprehensive restructuring of water pollution laws, Congress reenacted the oil spill cleanup provisions of § 102 in slightly modified form as § 311 of the FWPCA, 33 U.S.C. § 1321 (1976) (hereafter cited as § 1321). Pub.L. No. 92-500, § 2, 86 Stat. 862 (1972). Under § 1321(f)(1) the Government, with exceptions not relevant to this appeal, can recover its cleanup costs under a theory of strict liability from the vessel owner or operator, up to specified dollar limits.[8] The Government can recover its total cleanup costs if it can prove "willful negligence or willful misconduct within the privity and knowledge of the owner." The Act also requires vessels to establish evidence of financial responsibility up to the limits for recovery based on strict liability. Id. § 1321(p)(1). The Oil Pollution Act of 1924 was expressly repealed, Pub.L. No. 91-224, § 108, 84 Stat. 113 (1970), but no mention was made of either the preservation or repeal of additional remedies for cleanup costs under theories of public nuisance, maritime tort, or the Refuse Act.
 
 Non-Statutory Theories of Recovery
 
 9
 In order to determine whether the FWPCA preempts theories of recovery based on public nuisance or maritime tort, we must first bring into focus the nature of the claims the Government is asserting. Many passages in the Government's statement of its claim in the District Court and in its brief in this Court suggest that the Government is attempting to pitch liability upon two different bodies of law: federal common law and maritime law. To the extent that maritime law is judge-made, it can be viewed as simply one branch of federal common law. See, e. g., M. Redish, Federal Jurisdiction: Tensions in the Allocation of Judicial Power 97 (1980) (referring to "a federal common law of admiralty"). But we understand the Government to use the phrase "federal common law" in contrast to maritime law, i. e., referring to judge-made law pronounced on the law side of the district courts (or in the exercise of equity jurisdiction). See, e. g., Illinois v. Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); Friendly, In Praise of Erie-And of the New Federal Common Law, 39 N.Y.U.L.Rev. 383 (1964). In particular, the Government contends that its claim for recovery of cleanup costs may be based upon that aspect of federal common law revived or discovered in Illinois v. Milwaukee, supra : public nuisance resulting from interstate pollution of navigable water. With respect to maritime law, the Government is less precise in describing the pertinent aspects of this body of law on which it grounds liability for cleanup costs; the Government simply says Oswego is liable for a "maritime tort."
 
 
 10
 As we analyze the Government's non-statutory theories, they both must rest upon maritime law. The essential facts supporting the legal theories are that a vessel discharged oil into navigable waters of the United States and the United States incurred costs in cleaning up the oil from those waters. The facts satisfy the elements of admiralty jurisdiction-a maritime locality and a significant relationship to a traditional maritime activity. See Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). Whatever federal liabilities arise from these facts,[9] only maritime law, both judge-made and statutory, creates them.[10] In referring to both maritime law and federal common law as the sources of liability, the Government is apparently searching for bodies of law that will support theories of negligence and public nuisance. But maritime law, unless preempted by the FWPCA, can comprehend both theories. Negligent conduct causing loss to others constitutes a traditional maritime tort. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 413 & n.6, 74 S.Ct. 202, 207 & n.6, 98 L.Ed. 143 (1953); cf. Union Oil Co. v. Oppen, 501 F.2d 558, 567-68 (9th Cir. 1974). Whether non-negligent conduct amounting to a public nuisance creates liability within maritime law is more debatable, but this type of "maritime nuisance tort" has been recognized. National Sea Clammers Ass'n v. City of New York, 616 F.2d 1222, 1236 (3d Cir. 1980), rev'd without consideration of this point sub nom. Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, --- U.S. ----, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); Burgess v. M/V Tamano, 370 F.Supp. 247 (D.Me.1973).[11] We therefore conclude that both of the Government's non-statutory theories of recovery are based upon liabilities arising from judge-made maritime law.
 
 Refuse Act Theory of Recovery
 
 11
 The Government presents its theory of recovery based on the Refuse Act as if it were a statutory cause of action, but this theory also rests ultimately upon judgemade maritime law, though differing from the non-statutory nuisance and negligence theories in that they involved maritime law liabilities, whereas the Refuse Act theory involves a judicially created maritime remedy.
 
 
 12
 The Refuse Act, which is § 13 of the Rivers and Harbors Act of 1899, makes it unlawful to discharge any refuse matter into navigable water of the United States, and "refuse matter" has been construed to include oil accidentally discharged. United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966). While the Rivers and Harbors Act does not provide explicit remedies enabling the United States to recover costs incurred in removing anything placed in navigable water in violation of the various prohibitions of the Act, the authority of federal courts to fashion cost recovery remedies for the United States has been recognized. Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967) (costs of removing vessel negligently sunk in violation of § 15, 33 U.S.C. § 409 (1976)); United States v. Perma Paving Co., 332 F.2d 754 (2d Cir. 1964) (costs of removing fill deposited or permitted to be washed into water in violation of § 13); see United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960) (injunction to remove solid wastes creating obstruction in violation of § 10, 33 U.S.C. § 403 (1976), despite statutory injunction provision specifying removal only of "structures," § 12, 33 U.S.C. § 406 (1976)). In this case, the remedy sought by the Government to recover cleanup costs for an oil spill in violation of § 13 is a judge-made remedy, and, since the source of the spill is a vessel operating on navigable waters, the judge-made remedy to enforce § 13 must be grounded in non-statutory maritime law.
 
 
 13
 Criteria for Gauging Statutory Preemption of Judge-Made Law
 
 
 14
 In order to determine whether the liabilities and remedies grounded in judge-made maritime law have been preempted by the FWPCA, we next consider the criteria for assessing when federal statutes displace judicial law-making authority. In particular we examine whether the Supreme Court's approach to statutory preemption of judge-made law applies to maritime law as rigorously as it now appears to apply to non-maritime federal common law.
 
 
 15
 With respect to non-maritime federal common law, the Court has recently articulated a strict test for determining the preemptive effect of a federal statute. City of Milwaukee v. Illinois, --- U.S. ----, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). Instead of inquiring whether "Congress ha(s) affirmatively proscribed the use of federal common law," id. 101 S.Ct. at 1791, we are to conclude that federal common law has been preempted as to every question to which the legislative scheme "spoke directly," and every problem that Congress has "addressed." Ibid. While federalism concerns create a presumption against preemption of state law, including state common law, id. 101 S.Ct. at 1792; Jones v. Rath Packing Co., 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), separation of powers concerns create a presumption in favor of preemption of federal common law whenever it can be said that Congress has legislated on the subject.
 
 
 16
 Applying this test, the Court concluded in City of Milwaukee that the FWPCA preempted the federal common law of public nuisance in the area of interstate water pollution, at least to the extent of displacing the authority of a district court to impose more stringent effluent limitations upon sewer systems than those promulgated pursuant to § 301 of the Act, 33 U.S.C. § 1311 (1976). In Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, --- U.S. ----, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Court more broadly characterized City of Milwaukee as a determination that "the federal common law of nuisance in the area of water pollution" has been "entirely pre-empted" by the FWPCA. Id. 101 S.Ct. at 2627.
 
 
 17
 The Supreme Court has recognized, however, that the federal judiciary has a more expansive role to play in the development of maritime law than in the development of non-maritime federal common law. Texas Industries, Inc. v. Radcliff Materials, Inc., --- U.S. ----, ----, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981); Northwest Airlines, Inc. v. Transport Workers Union, --- U.S. ----, ----, 101 S.Ct. 1571, 1582-83, 67 L.Ed.2d 750 (1981); Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 285, 72 S.Ct. 277, 279, 96 L.Ed. 318 (1952); see Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 259, 99 S.Ct. 2753, 2756, 61 L.Ed.2d 521 (1979); Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978); United States v. Reliable Transfer Co., 421 U.S. 397, 409, 95 S.Ct. 1708, 1714, 44 L.Ed.2d 251 (1975); Fitzgerald v. United States Lines Co., 374 U.S. 16, 20, 83 S.Ct. 1646, 1650, 10 L.Ed.2d 720 (1963). The distinction is illustrated by contrasting the Court's willingness to create a right of contribution between joint tortfeasors under maritime law, Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974), and its unwillingness to create such a right under federal common law in the areas of antitrust, Texas Industries, Inc. v. Radcliff Materials, Inc., supra, or employment discrimination, Northwest Airlines, Inc. v. Transport Workers Union, supra.
 
 
 18
 In recognizing a substantial law-creating function for federal courts in maritime law, the Supreme Court appears to have applied the presumption of statutory preemption somewhat less forcefully to judge-made maritime law than to non-maritime federal common law. In several cases the Court has approved the creation of new rights pursuant to judge-made maritime law despite the presence of arguably preempting federal statutes. Thus, in Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), the Court created a maritime wrongful death action for deaths occurring within state territorial waters, notwithstanding that the maritime wrongful death action created by Congress was limited to deaths occurring on the high seas. Death on the High Seas Act (DOHSA), 46 U.S.C. §§ 761-767 (1976). In Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 585-90 & n.22, 94 S.Ct. 806, 814-17 & n.22 (1974), the Court interpreted maritime law to include loss of society within the measure of damages for a wrongful death in state territorial waters, notwithstanding that Congress had not included this component in the damages available for a statutory claim under DOHSA. See also American Export Lines, Inc. v. Alvez, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980) (extending Gaudet to claims for loss of society in cases of non-fatal injuries occurring in state territorial waters). And in Cooper Stevedoring Co. v. Fritz Kopke, Inc., supra, the Court created a right of contribution between joint tortfeasors under maritime law, notwithstanding substantial Congressional activity in the area of maritime personal injuries, see Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., supra, 342 U.S. at 285-86, 72 S.Ct. at 279-80.
 
 
 19
 Even more pertinent to the issues on this appeal are cases in which the Court has ruled that preexisting judge-made maritime law remains in force notwithstanding the enactment of statutes that arguably preempt the judge-made law. In The Chattahoochee, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801 (1899), a schooner carrying cargo sank after colliding with a steamship. Since both ships were at fault, the schooner was awarded half of her damages, but the steamship, pursuant to preexisting maritime law, was allowed to recoup one-half the value of the cargo from the schooner's award in order to reduce the steamship's liability to the cargo owner. The schooner sought to avoid liability for half of the cargo loss by relying on provisions of the Harter Act of 1893, 27 Stat. 445 (codified at 46 U.S.C. §§ 190-196 (1976)), which exempted owners of seaworthy vessels from liability for cargo damage resulting from navigation error. Though the Act would have shielded the schooner from liability to the cargo owner, the Court allowed the recoupment, concluding that the maritime rule for allocating damages in a collision between two vessels at fault applied notwithstanding the Harter Act. 173 U.S. at 549-55, 19 S.Ct. at 494-96. In The Kensington, 183 U.S. 263, 22 S.Ct. 102, 46 L.Ed. 190 (1902), the Court upheld a claim for the loss of a ship passenger's baggage, despite provisions of the passenger's ticket that sought to exonerate the ship from liability for negligence. On the assumption that the Harter Act did not apply to passengers' luggage, the Court reasoned that the judge-made rule preventing vessels from contracting away their liability for negligence remained in force as to luggage even though the Harter Act altered the rule as to cargo. In United States v. Atlantic Mutual Insurance Co., 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907 (1952), the Court, again applying the judge-made rule prohibiting immunity by contract, invalidated a bill of lading clause that had sought to shift to the cargo owner the carrying vessel's half of the loss caused by the combined negligence of the carrying vessel and another ship; the judge-made rule was invoked in this situation even as to a cargo loss, despite the fact that the Harter Act, as substantially reenacted by the Carriage of Goods by Sea Act of 1936, 49 Stat. 1207, 46 U.S.C. §§ 1300-1315 (1976), would have exonerated the carrying vessel of all liability if its negligence alone had caused the loss. See also Robert C. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 303-05, 79 S.Ct. 766, 770-71, 3 L.Ed.2d 820 (1959). More recently, in Edmonds v. Compagnie Generale Transatlantique, supra, the Court, in upholding a longshoreman's recovery against a negligent vessel, applied a judge-made rule prohibiting a proportional reduction for the concurrent negligence of third parties. The Court rejected the contention that the rule had impliedly been displaced by the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), Pub.L.No. 92-576, 86 Stat. 1251 (codified at 33 U.S.C. §§ 901-950 (1976)).
 
 
 20
 Though judge-made maritime law has thus been less easily displaced by statutory preemption than non-maritime federal common law, preemption of maritime law has occurred both as to prior judge-made law and the authority to fashion new law. In Isbrandtsen Co. v. Johnson, 343 U.S. 779, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952), the Court declined to apply prior maritime law permitting an employer a setoff against wages due a seaman, concluding that, in light of legislation that "touches nearly every phase of a seaman's life," id. at 784, 72 S.Ct. at 1015, only setoffs expressly authorized by statute should be allowed. In Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., supra, the Court declined to create a right of contribution against a longshoreman's employer in the face of the limitation of liability established by the LHWCA. See Cooper Stevedoring Co. v. Kopke, Inc., supra, 417 U.S. at 112, 94 S.Ct. at 2177. In Edmonds v. Compagnie Generale Transatlantique, supra, the Court, after deciding that the 1972 Amendments to the LWHCA did not preempt the existing rule that prohibits proportionate liability, concluded that the Amendments did preclude the Court from fashioning a new rule that would reduce a vessel's liability to a longshoreman to reflect concurrent negligence of third parties. Similarly, in Bloomer v. Liberty Mutual Insurance Co., 445 U.S. 74, 100 S.Ct. 925, 63 L.Ed.2d 215 (1980), the Court declined to fashion a new rule permitting a longshoreman to pass on to the employing stevedore a portion of the legal fee incurred by the longshoreman in his suit against the vessel; again the 1972 Amendments to the LHWCA were thought to preclude authority to initiate such a rule. In Mobil Oil Corp. v. Higginbotham, supra, the Court concluded that maritime law could not add loss of society to the statutory damages specified by DOHSA for wrongful death on the high seas. "When (Congress) does speak directly to a question, the courts are not free to 'supplement' Congress' answer so thoroughly that the Act becomes meaningless." 436 U.S. at 625, 98 S.Ct. at 2015. It was this "speak directly to a question" standard, expressed in an admiralty case, that the Court enlisted in City of Milwaukee to find that the FWPCA preempted the federal common law of interstate water pollution. 101 S.Ct. at 1791. These cases suggest that a presumption of legislative preemption applies to judge-made maritime law,[12] though less forcefully than it applies to non-maritime federal common law.[13]
 
 
 21
 We also think it reasonable to conclude that the force of the presumption of preemption is somewhat reduced when the judge-made law arguably preempted by a new statute is a remedy fashioned by admiralty or common law courts in aid of a preexisting statute. The presumption thus will have less force in this case when we proceed to consider whether the FWPCA preempts the judge-made maritime remedy entitling the Government to collect cleanup costs for violations of the Refuse Act. The presumption still retains more force than it would have if the issue were whether the FWPCA impliedly repeals any of the substantive provisions of the Refuse Act, for repeals of statutes by implication are disfavored. Radzanower v. Touche Ross & Co., 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976); United States v. United Continental Tuna Corp., 425 U.S. 164, 168, 96 S.Ct. 1319, 1322, 47 L.Ed.2d 653 (1976). On the other hand, the presumption of preemption does not apply as forcefully as it would apply, after City of Milwaukee, to bodies of federal common law, such as public nuisance arising from interstate water pollution, that are related to generalized federal interests, rather than to specific federal statutes. Judicially created remedies in aid of statutes like the Refuse Act fall somewhere between the federal common law of nuisance and the specific commands of the Refuse Act in their resistance to implied preemption by the FWPCA.
 
 
 22
 Ultimately determining whether non-statutory maritime law, as to both liabilities and remedies, survives enactment of a statute requires a careful analysis of several factors that the Supreme Court has considered relevant in assessing whether the presumption of preemption has been overcome. Any terms of the statute explicitly preserving or preempting judge-made law are of course controlling, as is clear evidence of Congressional intent to achieve such results. In the absence of clearly expressed legislative intent, legislative history may provide useful guidance.[14] The "scope of the legislation" must be assessed. City of Milwaukee v. Illinois, supra, 101 S.Ct. at 1791 n.8. A judgment must be made whether applying judge-made law would entail "filling a gap left by Congress' silence" or "rewriting rules that Congress has affirmatively and specifically enacted." Mobil Oil Corp. v. Higginbotham, supra, 436 U.S. at 625, 98 S.Ct. at 2015. The detail and comprehensiveness of a statute will frequently aid this determination.[15] Finally, Congress is less likely to have intended preemption of "long-established and familiar principles" of "the common law or the general maritime law." Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952), quoted in Edmonds v. Compagnie Generale Transatlantique, supra, 443 U.S. at 263, 99 S.Ct. at 2758. See also Robert C. Herd & Co. v. Krawill Machinery Corp., supra, 359 U.S. at 303-05, 79 S.Ct. at 770-71, The Kensington, supra, 183 U.S. at 268-69, 22 S.Ct. at 104.[16] In sum, we recognize, as City of Milwaukee instructs, that the doctrine of separation of powers creates a presumption that legislation preempts the role of federal judges in developing and applying federal common law, but we also recognize that it is not a simple task to determine the force and proper application of this presumption.[17] With these principles in mind, we turn to the impact of the FWPCA upon the Government's non-FWPCA theories of recovery.
 
 
 23
 Without any doubt the FWPCA legislates on the subject of recovery by the United States of its costs of cleaning up oil spilled into American waters. Section 1321(f) establishes a comprehensive remedial scheme providing for both strict liability up to specified limits and recovery of full costs upon proof of willful negligence or willful misconduct within the privity and knowledge of the owner. We must therefore start with a presumption that non-FWPCA maritime liabilities and remedies for oil spill cleanup costs of the United States have been preempted.
 
 
 24
 This presumption is not rebutted by the language of FWPCA. The remedies created by § 1321(f)(1) are established "notwithstanding any other provisions of law." While various meanings can be drawn from this phrase, see United States v. Dixie Carriers, Inc., 627 F.2d 736, 739 (5th Cir. 1980); Tug Ocean Prince, Inc. v. United States, 584 F.2d 1151, 1162 (2d Cir. 1978), cert. denied, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979); Note, Oil Spills, supra, 93 Harv.L.Rev. at 1772-73, we think it means that the remedies established by the FWPCA are not to be modified by any preexisting law. The main objective apparently was to assure that the limits on recoveries established by § 1321(f) are not to be varied by the different limits established by the Limitation Act. See In re Hokkaido Fisheries Co., 506 F.Supp. 631, 633-34 (D.Alaska 1981); G. Gilmore & C. Black, The Law of Admiralty 828 (2d ed. 1975). The "notwithstanding" phrase is not a preservation of preexisting bases of recovery.
 
 
 25
 Nor do any of the savings clauses of the FWPCA aid the Government's position. Section 511(a) of the Act, 33 U.S.C. § 1371(a), preserves the "authority or functions" of United States officers and agencies "not inconsistent" with the Act. It would torture the meaning of these words to interpret them as preserving "authority" of the United States to use non-FWPCA remedies to collect cleanup costs from discharging vessels. Elsewhere in the Act, when Congress sought to preserve a preexisting liability and remedy-the liability of vessel owners for damages to property from oil spills, 33 U.S.C. § 1321(o)(1) (1976), precise language was used, disclaiming any effect upon vessel owners' "obligations" under any provision of law. Moreover, § 1321(o) itself demonstrates that Congress used the term "authority" to mean something other than pursuing a legal remedy. Subsection (3) of § 1321(o) preserves certain aspects of federal "authority" (not pertinent to cleanup costs), thereby indicating, by comparison with subsection (1)'s reference to vessel owners' "obligations" that "authority" does not refer to the right to collect upon an owner's liability. In any event, whatever "authority" is preserved by § 1371(a) must be consistent with the Act, thereby raising the issue, to be considered infra, whether non-FWPCA remedies would be consistent with the remedies of § 1321(f). See Steuart Transportation Co. v. Allied Towing Corp., 596 F.2d 609, 616 (4th Cir. 1979).
 
 
 26
 The liability that is preserved by § 1321(o)(1) concerns only damage to property and does not include recovery of oil removal costs, Steuart Transportation Co. v. Allied Towing Corp., supra, 596 F.2d at 616; United States v. Dixie Carriers, Inc., 627 F.2d at 741-42, at least in circumstances like this case where the Government incurred cleanup costs in the exercise of its responsibilities for navigable waters and not in connection with restoring damaged Government property.[18]
 
 
 27
 Arguably of more significance is § 1321(h)(2), which preserves the Government's rights against "any third party whose actions may in any way have caused or contributed to" an oil spill. See United States v. Redwood City, 640 F.2d 963, 969-70 (9th Cir. 1981); Burgess v. M/V Tamano, 564 F.2d 964, 983 (1st Cir. 1977), cert. denied, 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978); United States v. Bear Marine Services, 509 F.Supp. 710 (E.D.La.1980), appeal pending No. 81-3251 (5th Cir.). This clause does not directly aid the Government's claim because cleanup costs are sought in this case from the discharging vessel's owner, and not from a third party. Nevertheless the existence of subsection (h) lends some support to the Government's position. It would be anomalous, the Government contends, for Congress to preserve non-FWPCA remedies against third parties (including vessels) if it had intended to abolish such remedies against discharging vessels and their owners. But even if the Government is correct that subsection (h) preserves all non-FWPCA remedies against all third parties,[19] it would be even more anomalous for Congress to have drafted express language to preserve such remedies against third parties while leaving the preservation of such remedies against ship owners to be inferred by courts. Once Congress legislates comprehensively on the subject of Government remedies for oil spill cleanup costs, the responsibility lies with Congress to spell out expressly what, if any, role remains for courts to fashion and apply non-statutory remedies. None of the savings clauses of the Act preserves the non-statutory remedies the Government is asserting in this case.[20]
 
 
 28
 The Government invites us to interpret the Act as not preempting non-statutory remedies by relying on isolated statements drawn from the legislative history of the FWPCA. For example, the Government cites the explanation given to the House by Representative Cramer concerning the compromise bill that emerged from the Conference Committee. After describing the provisions for strict liability up to specified dollar limits, the Congressman stated
 
 
 29
 In the case of cleanup necessitated as a result of a willful spill or of a negligent spill, the benefits of limitations of liability would be removed and where the privity or knowledge of the owner of the vessel was involved he would be required to pay the full costs for cleanup.
 
 
 30
 116 Cong.Rec. 9327 (1979). The Government contends that the Congressman deliberately separated the phrases "willful spill or of a negligent spill" and "where the privity or knowledge of the owner of the vessel was involved" and thereby implicitly recognized the existence of a non-statutory maritime tort remedy based on ordinary negligence.[21] We find this interpretation unpersuasive. The separation of the statutory phrases in the Congressman's explanation appears to be without significance. He was explaining the provisions of the bill and was doubtless understood at the time as meaning that the bill provided for unlimited liability "as a result of a willful spill or of a negligent spill within the privity or knowledge of the owner." The "privity (and) knowledge" phrase was, as the statute specifies, an additional, not an alternative, requirement of unlimited liability. Thus understood, the Congressman's explanation sheds no light on the existence of non-FWPCA remedies.[22] If we were faced with a traditional question of statutory interpretation requiring us to give precise content to a vague term of a statute, we would have serious doubts whether the fragmentary evidence of Congressional intent supports the Government's position. However, City of Milwaukee instructs us to be cautious in making even educated guesses about Congressional intent when the consequence would be to maintain a common law remedy on a subject dealt with in legislation. Suffice it to say that we do not find evidence of Congressional intent that rebuts the presumption of legislative preemption.
 
 
 31
 An analysis of each of the Government's three non-FWPCA theories of recovery indicates that the other factors that we have identified as relevant to an assessment of whether the presumption of preemption has been overcome are likewise of no help to the Government's position. These other factors include the scope of the preempting legislation, its detail and comprehensiveness, whether the judge-made law is filling a gap in legislation or effectively rewriting the statute, and how well established the judge-made law was at the time of the statute's passage.
 
 
 32
 With respect to the Government's maritime nuisance tort theory, the Supreme Court has ruled in City of Milwaukee and National Sea Clammers that the comprehensive provisions of the FWPCA regarding effluent discharges preempt the public nuisance ingredient of this approach, at least in the context of non-maritime federal common law. We see no reason why the "often vague and indeterminate nuisance concepts," City of Milwaukee, supra, 101 S.Ct. at 1792, to whatever extent imported into maritime law, should survive the comprehensive and detailed provisions of the FWPCA regarding Government recovery of oil spill cleanup costs. The contours of a federal common law of public nuisance are unsettled, and the recognition of such concepts within maritime law is of recent vintage. See Burgess v. M/V Tamano, 370 F.Supp. 247 (D.Me.1973).
 
 
 33
 To whatever extent judge-made remedies for violation of the Refuse Act include recovery for cleanup costs based on strict liability,[23] such remedies would be plainly inconsistent with the FWPCA, because the strict liability remedy of the FWPCA is subject to dollar limitations, while recovery of damages under the Rivers and Harbors Act of 1899, when permitted at all, is not subject to the limits of the Limitation Act, University of Texas Medical Branch v. United States, 557 F.2d 438 (5th Cir. 1977), cert. denied, 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978); In re Chinese Maritime Trust, Ltd., 478 F.2d 1357 (2d Cir. 1973), cert. denied, 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 98 (1974).[24] Allowing the Government a judge-made damage remedy without limits in strict liability under the Refuse Act would amount to "rewriting rules that Congress has affirmatively and specifically enacted." Mobil Oil Corp., supra.
 
 
 34
 Whether the presumption of preemption of non-FWPCA liabilities and remedies based on negligence has been overcome requires further analysis. If the FWPCA means what it says in permitting recovery of full cleanup costs upon proof of "willful negligence or willful misconduct" within the knowledge and privity of the owner,[25] such a remedy would be inconsistent with a maritime negligence remedy, since the latter would avoid the limits of the Limitation Act simply upon proof of ordinary negligence within the privity or knowledge of the owner. While alternative remedies with dissimilar characteristics can sometimes coexist side by side, when two remedies differ on such an essential element of a cause of action as the degree of negligence that must be demonstrated in order to permit unlimited recovery, the remedies become inconsistent. To permit a judge-made remedy so significantly different from the one Congress has expressly provided would amount to rewriting the rule that Congress has enacted. On the other hand, if, as the Government contends, the reference in § 1321(f) to "willful negligence or willful misconduct" is only an inartistic way of expressing ordinary negligence,[26] then Congress has, for no apparent reason, created an FWPCA negligence remedy for full costs to stand along side a similar maritime tort remedy.
 
 
 35
 Whatever degree of negligence applies to a claim for full costs under § 1321(f), a holding against preemption would result in a four-tiered scheme of liabilities: strict liability under the FWPCA up to FWPCA limits, common law liability for negligence not within the knowledge or privity of the owner up to Limitation Act limits, common law liability for negligence within the knowledge or privity of the owner without limits (because the Limitation Act would not apply), and FWPCA liability for "willful negligence or willful misconduct" within the privity and knowledge of the owner (because the FWPCA limits would not apply). The FWPCA would be the basis for recovery on the two ends of the spectrum of recoveries, but judge-made law would be the basis for the two means of recovery in the middle. A statute would have to specify such an unwieldy scheme with express provisions before a court could assume that it may continue to administer the common law components of such an arrangement.[27] Without such an express provision, judge-made remedies falling within the scope of the remedies provided by the statute are preempted, at least in the context of a statute as comprehensive as § 1321.
 
 
 36
 For all these reasons, we agree with those courts that have ruled, even prior to City of Milwaukee, that § 1321(f) has preempted the Government's non-FWPCA remedies against a discharging vessel for cleanup costs. See, e. g., United States v. Dixie Carriers, Inc., supra; Steuart Transportation Co. v. Allied Towing Corp., supra; United States v. Tug J. P. McAllister, Civ.No. 76-462 (D.P.R. Apr. 3, 1980). See also Tug Ocean Prince, Inc. v. United States, supra, 584 F.2d at 1162.
 
 2. The Claim for Cleanup of Canadian Waters
 
 37
 The Canadian portion of the United States' claim concerns only the costs of cleaning up oil from Canadian waters. The United States seeks to recover the money it reimbursed Canada for cleanup costs that Canada incurred. We disagree with the District Court that this portion of the Government's claim has been preempted by the FWPCA and reverse the Court's denial of the Government's motion to amend its complaint to amplify the reimbursement claim.
 
 
 38
 The FWPCA explicitly limits its coverage to Government recovery of costs for the cleanup of American territorial waters. 33 U.S.C. § 1321(b)(1) (1976) declares that "it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone," § 1321(b)(3) prohibits "(t)he discharge of oil ... into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone," and § 1321(c)(1) authorizes the President to act to remove oil discharged "into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone."[28] The broader purpose of the FWPCA in its entirety is "to restore and maintain the chemical, physical, and biological integrity of the Nations's waters." Id. § 1251(a). See also United States v. Ashland Oil & Transportation Co., 504 F.2d 1317, 1320-25 (6th Cir. 1974). The legislative history further supports the conclusion that the FWPCA concerns only the cleanup of pollution in American waters. Congressman Dingell, in discussing the "navigable waters" that the FWPCA covers, stated: "It means all 'the waters of the United States' in a geographical sense." 118 Cong.Rec. 33756 (1972). And Representative Cramer noted,
 
 
 39
 If there are charges that another government would wish to make, say in the case of a spill that involved both the United States and Canada, ... these would be in addition and would not be subject to our limitation of liability.
 
 
 40
 116 Cong.Rec. 9327 (1970).
 
 
 41
 While a statute might have a preemptive effect upon some matters outside its coverage, the preemption analysis we have discussed leaves no possibility that the FWPCA has any effect on claims for cleaning the territorial waters of foreign countries. The FWPCA does not "speak to" the problem of polluting foreign waters, and therefore no presumption of preemption arises. When an entire subject is outside the scope of a statute, liabilities and remedies concerning that subject remain in force unless the statute unmistakably evidences Congressional intention to alter them. It cannot be said that Congress, in creating specific remedies for cleanup of oil from American waters, affirmatively legislated to preclude remedies concerning foreign waters. Obviously the FWPCA does not purport to affect Canada's rights to sue a vessel discharging into American waters oil that pollutes Canadian waters. And we find nothing in the statute to suggest that Congress intended to alter any rights the United States may have to collect money reimbursed to Canada for Canada's costs, whether the claim of the United States for reimbursement is derived from treaty obligations, subrogation, or otherwise. In rejecting the contention that the reimbursement claim is preempted by the FWPCA, we express no views on whether the United States is entitled to reimbursement, nor whether public nuisance or more traditional maritime tort law or treaty rights provide a basis for Oswego's liability.[29]
 
 
 42
 In denying the Government's motion to amend its complaint, the District Court indicated the possibility of prejudice to other parties. We see no basis for this concern. Oswego has long been aware of the existence of the Canadian claims, and the Government sent it the relevant invoice no later than early 1978. The amendment does not assert a new claim, since the original claim for $9 million included the Canadian claim, though not identifying it as a separate amount.
 
 
 43
 Finally, we reject Oswego's contention that the reimbursement claim is time-barred. The reimbursement claim of the United States arises out of the same conduct, transaction, or occurrence set forth in the Government's original claim and therefore relates back to the date that claim was filed. Fed.R.Civ.P. 15(c).
 
 
 44
 Accordingly, the judgment is affirmed in part, reversed in part, and remanded to permit the Government to amend its complaint to amplify its claim for money reimbursed to Canada.
 
 
 
 *
 The Honorable Edward Dumbauld of the United States District Court for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The Agreement Between the United States of America and Canada on Great Lakes Water Quality, 23 U.S.T. 301 (1972), provides that "the costs of operations of both Parties under the (Joint Contingency Plan for oil and hazardous spills in boundary waters) shall be borne by the Party in whose waters the pollution incident occurred." Annex 8, P 4. 23 U.S.T. at 341
 Under Article IV of the Boundary and Waters Treaty of 1909, T.S. No. 548, 36 Stat. 2448, 2450, between Canada and the United States, "It is ... agreed that the waters herein defined as boundary waters and waters flowing across the boundary shall not be polluted on either side to the injury of health or property in the other."
 
 
 [2]
 The District Court's decision is reported at 1979 A.M.C. 333 (N.D.N.Y.1978)
 
 
 [3]
 The Government's claim for penalties of $500-$2500 under § 16 of the Rivers and Harbors Act, 33 U.S.C. §§ 411, 412 (1976), was also dismissed without prejudice since it too would not be subject to limitation
 
 
 [4]
 See Tug Ocean Prince, Inc. v. United States, 584 F.2d 1151, 1153 (2d Cir. 1978), cert. denied, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979); In re Hokkaido Fisheries Co., 506 F.Supp. 631, 632, 634-35 (D.Alaska 1981); In re Oswego Barge Corp., 439 F.Supp. 312, 320 (N.D.N.Y.1977). See also Lake Tankers Corp. v. Henn, 354 U.S. 147, 152-54, 77 S.Ct. 1269, 1272-73, 1 L.Ed.2d 1246 (1957); Hines, Inc. v. United States, 551 F.2d 717, 728-29 (6th Cir. 1977); In re Chinese Maritime Trust, Ltd., 478 F.2d 1357, 1361-62 (2d Cir. 1973), cert. denied, 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 98 (1974)
 
 
 [5]
 If the theory was the common law of public nuisance, the Government would have had to show "an unreasonable interference with a right common to the general public." United States v. Ira S. Bushey & Sons, 363 F.Supp. 110, 120 (D.Vt.) (Oakes, J.), aff'd without opinion, 487 F.2d 1393 (2d Cir. 1973), cert. denied, 417 U.S. 976, 94 S.Ct. 3182, 41 L.Ed.2d 1146 (1974)
 
 
 [6]
 The maritime tort could involve a claim of negligence or, borrowing from common law, a claim of public nuisance. See Burgess v. M/V Tamano, 370 F.Supp. 247 (D.Me.1973)
 
 
 [7]
 For a discussion of the elusive concept of "within the privity or knowledge of" the vessel owner, see G. Gilmore & C. Black, The Law of Admiralty §§ 10-20 to -24 (2d ed. 1975)
 
 
 [8]
 At the time of the oil spill § 1321(f)(1) provided:
 Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any vessel from which oil or a hazardous substance is discharged in violation of subsection (b) (3) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for removal of such oil or substance by the United States Government in an amount not to exceed $100 per gross ton of such vessel or $14,000,000, whichever is lesser, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs.
 33 U.S.C. § 1321(f)(1) (1976). The statute has since been amended to permit recovery, from a vessel (other than an "inland oil barge") carrying oil as cargo, of the greater of $150 per gross ton or $250,000. Clean Water Act of 1977, Pub.L. No. 95-217, § 58(d)(2), 91 Stat. 1566, 1595 (codified at 33 U.S.C. § 1321(f)(1) (Supp. II 1978)).
 The enumerated exceptions to strict liability for discharges caused by an act of God, etc. are not relevant to this appeal.
 
 
 [9]
 The United States makes no claim that liability for recovery of cleanup costs can be grounded upon the law of a state bordering the St. Lawrence Seaway. Cf. Askew v. American Waterways Operators, Inc., 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973)
 
 
 [10]
 Though it constantly refers to the public nuisance theory as something apart from the maritime law, the Government's claim in the limitation action introduces the statement of each of its legal theories, including the public nuisance theory, with the allegation, "This is an admiralty and maritime claim...." Claim of the United States, Second Claim, P 13, realleging P 1
 
 
 [11]
 In Burgess, on which Sea Clammers relied, Judge Gignoux recognized the absence of an "established" admiralty rule governing the nuisance claim, but upheld the claim in the exercise of admiralty jurisdiction without determining whether the maritime law to be applied was to be drawn from a newly fashioned uniform national rule or from the applicable law of the state in whose coastal waters the spill occurred. 370 F.Supp. at 249
 
 
 [12]
 "(E)ven in admiralty, ... where the federal judiciary's lawmaking power may well be at its strongest, it is (the Court's) duty to respect the will of Congress." Northwest Airlines, Inc. v. Transport Workers Union, supra, 101 S.Ct. at 1583. See Panama R.R. v. Johnson, 264 U.S. 375, 386-88, 44 S.Ct. 391, 393-94, 68 L.Ed. 748 (1924)
 
 
 [13]
 At first glance, the Supreme Court's recent decision in Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, supra, appears to indicate that the preemptive effect of legislation upon maritime law is not merely less than the effect upon non-maritime federal common law, but is of scarcely any force at all. In the District Court, the Sea Clammers Association, like the Government here, had separately alleged a claim under the federal common law of public nuisance and a claim of maritime tort. The District Court rejected the nuisance claim as unavailable to a private party and rejected the maritime claim, in part, for inadequate pleading. The Third Circuit reversed, reinstating both claims, among others. National Sea Clammers Ass'n v. City of New York, 616 F.2d 1222, 1233-35, 1235-37 (3d Cir. 1980). The Supreme Court, in a limited grant of certiorari, included as one of the questions, "Whether any federal common law nuisance action for alleged damages sustained resulting from ocean pollution, if available to a private citizen, is not preempted by" the FWPCA and the Marine Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C. §§ 1401-1444 (1976). 449 U.S. 917, 917-918, 101 S.Ct. 314, 314-315, 66 L.Ed.2d 145 (1980). The grant of certiorari did not expressly include any question bearing upon plaintiff's claim of a maritime tort. The Court also framed the following question in its grant of certiorari: "Whether a private citizen has standing to maintain a federal common law nuisance action for alleged damages sustained resulting from ocean pollution as a general federal question under 28 U.S.C. § 1331." 101 S.Ct. at 314. Since a claim based on maritime law does not arise under the laws of the United States within the meaning of § 1331 jurisdiction, Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), it might appear that the Supreme Court understood it was reviewing (and ultimately finding preempted) only plaintiff's federal common law claim and not its maritime tort claim. An available inference is that the Court thought the maritime claim was not preempted
 However, unlike the case before us, in which the Government's maritime claim includes both a nuisance theory and a negligence theory, the maritime claim in Sea Clammers rests solely on a theory of public nuisance. 616 F.2d at 1236. Therefore, the Supreme Court could well have understood that by determining that the FWPCA preempts the federal common law of nuisance, the Court was in effect rejecting both the common law claim based on § 1331 jurisdiction as well as the maritime claim based on § 1333 jurisdiction. The Court was not reviewing the maritime claim as such, but it was nonetheless finding its sole component to have been preempted.
 
 
 [14]
 To determine whether DOHSA spoke to the question of maritime deaths or only to the narrower question of maritime deaths on the high seas, the Court consulted Congressional history. See Moragne v. States Marine Lines, Inc., supra, 398 U.S. at 400 n.14, 90 S.Ct. at 1787 n.14. And a judgment as to Congressional purpose was required to determine in Mobil Oil that DOHSA spoke to the question of damages for maritime deaths on the high seas, rather than to the narrower question of compensation for pecuniary loss. Even in City of Milwaukee Congressional history is explored, at least to rebut contentions that Congress intended to preserve federal common law. 101 S.Ct. at 1797-1800
 
 
 [15]
 In determining whether statutes leave room for judge-made law, courts sometimes confront a narrow "window." Judge-made law may be fashioned when Congress has provided "enough federal law" so that a legislative purpose is clear, United States v. Republic Steel Corp., supra, 362 U.S. at 492, 80 S.Ct. at 890, but not when Congress has provided so much federal law that its detail or comprehensiveness would be undermined by common law supplements
 
 
 [16]
 Supreme Court decisions determining the applicability of common law immunity doctrines to actions brought under 42 U.S.C. § 1983 (1976) also illustrate the importance of this factor. Compare City of Newport v. Fact Concerts, Inc., --- U.S. ----, ---- - ----, 101 S.Ct. 2748, 2755-59, 69 L.Ed.2d 616 (1981) (punitive damages against municipality disallowed because of well-settled common law immunity), with Owen v. City of Independence, 445 U.S. 622, 637-38, 646-48, 650, 100 S.Ct. 1398, 1408-09, 1413-14, 1415, 63 L.Ed.2d 673 (1980) (compensatory damages against municipality allowed in the absence of well-settled common law immunity). See also Allen v. McCurry, 449 U.S. 90, 96-99, 101 S.Ct. 411, 416-17, 66 L.Ed.2d 308 (1980) (traditional common law rules of collateral estoppel and res judicata not preempted by § 1983)
 
 
 [17]
 "Interpreting" a statute to determine its preemptive effect upon federal common law analytically differs from the task of determining the meaning of statutes in order to apply their often general terms to specific situations. The latter task inevitably propels federal courts into a law-making role. The former task confronts courts with a decision as to whether, in light of pertinent statutes, their "interstitial" law-making role, Southern Pacific Co. v. Jensen, 244 U.S. 205, 221, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting), with respect to federal common law remains. See Glus v. G. C. Murphy Co., 629 F.2d 248, 259-68 (3d Cir. 1980) (Sloviter, J., dissenting), vacated and remanded sub nom. Retail, Wholesale & Dep't Store Union v. G. C. Murphy Co., --- U.S. ----, 101 S.Ct. 2013, 68 L.Ed.2d 321 (1981)
 PCA Preemption
 
 
 [18]
 The Government contends that the following quotation of Senator Baker indicates that Congress did not intend to distinguish between claims for damages to property and for removal costs in subsection (o)(1):
 I wonder if you might ... consider that the potential exposure for property damage in the conventional sense would be combined at least to some extent with this new separate and additional coverage ... and therefore has the effect of expanding the insurability of the risks that we are dealing with.... (C)leanup costs ... do have inevitably the effect of diminishing the size of the risk from property damage....
 The point I am trying to make is that if there is an absolute or a strict liability imposed on a shipper and owner for cleanup costs, that cleaning up oil inevitably becomes a part of the potential risk of property damage. Therefore, they are intertwined and interrelated, and it is not "a separate and additional cost," but rather a part of the property damage claim which you have already insured.
 Hearings on S. 7 and S. 544 Before the Subcomm. on Air and Water Pollution of the Senate Comm. on Public Works, 91st Cong., 1st Sess. 1382-83 (1969). But the full context of the Senator's remarks indicates that he was not construing the effect of subsection (o)(1), but was merely trying to get the insurance industry to admit that the insuring of a ship for strict liability of cleanup costs should result in a reduction in the insurance risk from property damage since cleaning up the oil will mean there will be less property damage in the long run.
 
 
 [19]
 It has been held that subsection (h) does not preserve remedies against all third parties causing oil spills, but only against third parties that are not the sole cause of such spills. United States v. Bear Marine Services, supra. This position is derived from analyzing subsections (f), (g), and (h) together. Subsection (f) creates rights in the United States against a discharging vessel causing an oil spill. Subsection (g) creates virtually identical rights in the United States against third parties that are the sole cause of a spill. Since neither subsection covers third parties that are a partial cause of a spill, subsection (h) preserves existing remedies as to them. This reading, however, creates the anomaly of preserving non-FWPCA remedies against third parties that contribute to oil spills, but not against third parties that are the sole cause of such spills. A possible explanation is that Congress wished to preserve non-FWPCA remedies only against those whom it was not subjecting to the new strict liability provisions of the Act
 
 
 [20]
 The parties have disputed the extent to which the savings clauses of the FWPCA preserve the Rivers and Harbors Act of 1899, see, e. g., § 511(a)(2) of the FWPCA, 33 U.S.C. § 1371(a)(2), explicitly maintaining the authority of the Secretary of the Army under the 1899 Act. However, as previously noted, we are not concerned with whether any provision of the 1899 Act has been preempted or preserved, but only whether the judicially created damage remedy in aid of § 13 has been preempted. See also Steuart Transportation Co. v. Allied Towing Corp., supra, 596 F.2d at 616-17; United States v. Rohm & Haas Co., 500 F.2d 167, 171 n.1 (5th Cir. 1974); United States v. Dixie Carriers, Inc., 462 F.Supp. 1126, 1129 (E.D.La.1978), aff'd, 627 F.2d 736 (5th Cir. 1980)
 
 
 [21]
 The Government contends that by separating the phrases the Congressman was describing two different situations in which the vessel owner might be liable for cleanup costs beyond the strict liability limits of the FWPCA: (a) a willful or negligent spill not within the privity or knowledge of the owner and (b) a willful or negligent spill within the privity or knowledge of the owner. (The statutory language is "willful negligence or willful misconduct" and we intimate no view as to the significance of Representative Cramer's remark with respect to the standard of care in an FWPCA cause of action for recovery of full costs, since that issue remains for decision by the District Court in the Government's pending FWPCA suit.) The Government's point is that whatever standard of care the FWPCA contemplates for unlimited liability, if the Congressman was referring to the possibility of recovery beyond the FWPCA limits in the case of a willful or negligent spill not within the privity or knowledge of the owner, he must have had in mind recovery under a non-statutory maritime tort based on ordinary negligence. Such a recovery under principles of maritime tort would presumably be subject to the limits of the Limitation Act, but because those limits could be higher than the FWPCA's limits, see note 27 infra, increased recovery would be possible. Unlimited recovery in the second situation described by Representative Cramer would presumably be available either under the FWPCA (under the Government's interpretation of its language) or under a maritime tort theory (since the Limitation Act would no longer apply)
 
 
 [22]
 The Government also relies on a statement in 1979 by Representative Breaux, of the Subcommittee on Water Resources of the House Committee on Public Works and Transportation, that he did not think anyone on his committee thought they were creating an exclusive remedy in 1970 in passing what became § 1321(f). Comprehensive Oil Pollution Liability and Compensation Act: Hearings on H.R. 85 Before the Subcomm. on Water Resources of the House Comm. on Public Works and Transportation, 96th Cong., 1st Sess. 380 (1979). We are not inclined to give controlling weight to statements of individual Congressmen well after the passage of legislation. The views of a subsequent Congress, let alone an individual Congressman, "form a hazardous basis for inferring the intent of an earlier one." Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980) (quoting United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960)). See Quern v. Mandley, 436 U.S. 725, 736 n.10, 98 S.Ct. 2068, 2075 n.10, 56 L.Ed.2d 658 (1978); City of Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 714, 98 S.Ct. 1370, 1378, 55 L.Ed.2d 657 (1978)
 
 
 [23]
 The District Court assumed that the vessel owner would be strictly liable to the United States for violations of the Refuse Act. The Fifth Circuit has also assumed that recovery under the Refuse Act would be on a strict liability basis. United States v. Dixie Carriers, Inc., supra, 627 F.2d at 741
 In re Chinese Maritime Trust, Ltd., 478 F.2d 1357, 1359 (2d Cir. 1973), cert. denied, 414 U.S. 1143, 94 S.Ct. 894, 39 L.Ed.2d 98 (1974), might be read to suggest that a vessel owner is strictly liable to the United States for violations of § 15 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 409 (1976) (known as the Wreck Act), although the claim in that case alleged negligence, In re Chinese Maritime Trust, Ltd., 361 F.Supp. 1175, 1178 (S.D.N.Y.1972). The Supreme Court in Wyandotte Transportation Co. v. United States, supra, 389 U.S. at 197 n.6, 88 S.Ct. at 384 n.6, specifically held open the question of what relief "if any" is available to the Government for a non-negligent violation of the Wreck Act.
 
 
 [24]
 We have no occasion to reconsider, in light of City of Milwaukee, the impact of the FWPCA upon injunction remedies to enforce the Refuse Act. See United States v. Ira S. Bushey & Sons, 363 F.Supp. 110 (D.Vt.) (Oakes, J.), aff'd without opinion, 487 F.2d 1393 (2d Cir. 1973), cert. denied, 417 U.S. 976, 94 S.Ct. 3182, 41 L.Ed.2d 1146 (1974)
 
 
 [25]
 The meaning of § 1321(f) as applied to the Government's statutory claim for recovery of full cleanup costs remains to be determined in the Government's pending FWPCA action against Oswego. We intimate no views on what the Government must prove to prevail on that claim
 
 
 [26]
 In the Government's view, the statute's reference to "the privity and knowledge of the owner" modifies only "willful misconduct" rather than both "willful negligence" and "willful misconduct." Furthermore, the Government contends that "willful" in this context means only "knowing."
 
 
 [27]
 The anomalies that would result if common law remedies were not preempted are accentuated by the fact that the Limitation Act would impose upon claims for negligence not within the privity or knowledge of the owner limits that could be either higher or lower than the limits of the FWPCA upon the statutory cause of action for strict liability. The variation in limits arises because the Limitation Act sets limits based on the value of the vessel after the spill, whereas the FWPCA sets dollar limits based on tonnage. If the vessel is still valuable after the spill, the Limitation Act may provide limits far higher than those of the FWPCA; on the other hand, if the vessel is rendered of little or no value by the occurrence that caused the spill, the Limitation Act limits would be far below those of the FWPCA
 
 
 [28]
 "Contiguous zone" is defined as "the entire zone established or to be established by the United States under article 24 of the Convention on the Territorial Sea and the Contiguous Zone." 33 U.S.C. § 1321(a)(9) (1976)
 
 
 [29]
 We agree with the District Court that the Refuse Act provides no basis for the reimbursement claim since that Act, like the FWPCA, does not apply to Canadian waters. See 33 U.S.C. § 407 (1976)