UNITED STATES of America, Plaintiff,

v.

OUTBOARD MARINE CORPORATION, et al., Defendants.

No. 78 C 1004.

United States District Court, N.D. Illinois, E.D.

Oct. 8, 1982.

---

James T. Hynes, James P. White, Asst. U.S. Attys., Chicago, Ill., Elizabeth Stein, Atty., Dept. of Justice, Washington, D.C., M. Kaye Jacobs, Sebastian Patti, Enforcement Attys., U.S. E.P.A., Chicago, Ill., John Wheeler, Atty., U.S. E.P.A., Washington, D.C., for U.S.

John Van Vranken, Asst. Atty. Gen., Chicago, Ill., for State of Ill.

Richard Phelan, Michael A. Pope, Roseann Oliver, Phelan, Pope & John, Richard J. Kissel, Jeffrey C. Fort, Carol L. Dorge, Martin, Craig, Chester & Sonnenschein, Chicago, Ill., for Outboard Marine Corp.

Fred H. Bartlit, Jr., James H. Schink, Bruce A. Featherstone, Robert E. Shapiro, Kirkland & Ellis, Chicago, Ill., for Monsanto Co.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

Defendant Outboard Marine Corporation ("OMC") has moved to dismiss Counts I and II of the Second Amended Complaint of the United States. For the reasons stated below, the motion is denied.[1]

*Count I—The Refuse Act*

Count I of the Second Amended Complaint seeks relief under the Refuse Act, 33 U.S.C. § 407.[2] Count I includes allegations that from approximately 1959 until 1972 OMC used a PCB-bearing hydraulic fluid in its Waukegan, Illinois facility; that leaks and spills of this fluid were routed into the facility's wastewater collections; that the wastewater collections were discharged into Lake Michigan, the Waukegan Harbor, and the North Ditch, a tributary of Lake Michigan; that as a result, PCBs were and continue to be discharged into Lake Michigan, the Waukegan Harbor and the North Ditch; and that until 1975 OMC had not applied

---

1. The Government's motion for summary judgment on Count I will be considered separately.

2. In this opinion the term "Refuse Act" will be used to refer to Section 13 of the Rivers and Harbors Act of March 3, 1899, 33 U.S.C. § 407. Occasionally, the term "Refuse Act" has been applied to the entire Rivers and Harbors Act.

for a permit to discharge PCBs. The Government requests that OMC be ordered to construct a bypass of the North Ditch, to remove and treat allegedly contaminated soil and groundwaters from OMC's property, and to dredge the Waukegan Harbor and the North Ditch.

OMC does not dispute that a violation of the Refuse Act has been alleged; instead, OMC urges that for various reasons the requested relief is not available under the Refuse Act. OMC's two lines of argument are as follows. First, OMC argues that "remedial actions pursuant to the Refuse Act have been precluded by § 4(a), the savings provision of the Clean Water Act." Second, OMC argues that since the Refuse Act does not provide expressly for any injunctive remedies, injunctive relief that courts in the past have decreed to enforce the Refuse Act was judge-made law; such relief therefore should be treated as federal common law, preempted by the 1972 amendments to the Clean Water Act. *Milwaukee v. Illinois,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) ("Milwaukee II").

The savings clause on which OMC bases its first argument reads:

No suit, action, or other proceeding lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under the Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act shall abate by reason of the taking effect of the amendment made by section 2 of this Act. [Section 2 of the 1972 amending Act included all the substantive amendments.] The court may, on its own motion or that of any party made at any time within twelve months after such taking effect, allow the same to be maintained by or against the Administrator or such officer or employee.

Water Pollution Control Act Amendments of 1972, Pub.L.No. 92–500, § 4(a), 86 Stat. 896–97. This clause saves certain litigation pending on the effective date of the 1972 amendments (October 18, 1972) and, with leave of court, litigation filed within a year after that date. Several cases have held that pending Refuse Act litigation was intended to be saved by this provision. *E.g., Reserve Mining Co. v. EPA,* 514 F.2d 492 (8th Cir. 1975).[3] OMC argues by negative inference: since the present action was filed more than one year after the 1972 amendments took effect, the Refuse Act count is not saved by this clause, and it therefore must be dismissed. Language in the second Court of Appeals decision in this case seems to endorse OMC's view:

The enactment of § 4(a), Pub.L.No. 92–500 § 4(a), 86 Stat. 896–97, which preserves those prosecutions under the Refuse Act of 1899, 33 U.S.C. § 407, that were begun before October 18, 1972, provides further evidence that Congress considered the problem of pre-1972 discharges, and specifically the appropriate role in the statutory scheme for remedies against polluters.

*Illinois v. Outboard Marine Corp.,* 680 F.2d 473, 478 (7th Cir. 1982) ("OMC II"). OMC's argument cannot, however, survive a close examination of the 1972 amendments.

Another section of the 1972 amendments expressly preserves the Refuse Act as a valid basis for federal authority in the area of water pollution:

This Act shall not be construed as (1) limiting the authority or functions of any officer or agency of the United States under any other law or regulation not inconsistent with this Act; (2) affecting or impairing the authority of the Secretary of the Army (A) to maintain navigation or (B) under the Act of March 3, 1899

---

**3.** The legislative history of the 1972 amendments carries clear statements that Section 4(a) was intended to save pending Refuse Act litigation, with legislators showing especial concern that the *Reserve Mining* litigation be saved. 1A Legislative History of the Water Pollution Control Act Amendments of 1972 at 176 (remarks of Sen. Muskie, Oct. 4, 1972), 190–94 (remarks of Sen. Griffin, Oct. 4, 1972), 247–48 (remarks of Rep. Dingell and Rep. Wright, Oct. 4, 1972).

(30 Stat. 1112); except that any permit issued under section 404 of this Act shall be conclusive as to the effect on water quality of any discharge resulting from any activity subject to section 10 of the Act of March 3, 1899, or (3) affecting or impairing the provisions of any treaty of the United States.

Water Pollution Control Act Amendments of 1972, § 511(a), 33 U.S.C. § 1371(a).[4] That this section operates to preserve the Refuse Act was recognized in *United States v. Rohm & Haas,* 500 F.2d 167, 170 n. 1 (5th Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1352, 43 L.Ed.2d 439 (1975), and *United States ex rel. Scott v. U.S. Steel Corp.,* 356 F.Supp. 556, 559 (N.D.Ill.1973) (McMillen, J.).

■ The principal effect of the 1972 amendments on the Refuse Act was the replacement of the Refuse Act discharge permit program with the new NPDES permit program. Water Pollution Control Act Amendments of 1972, § 402(a)(4), 33 U.S.C. 1342(a)(4). Apparently to encourage prompt issuance of the new NPDES permits, the 1972 amendments provided that a pending permit application would immunize a discharger from prosecution—under the new amendments or under the Refuse Act—until December 31, 1974. Act, Section 402(k), 33 U.S.C. 1342(k). The fear thus was raised that under this provision defendants in prosecutions planned or pending when the amendments took effect could force dismissal of the Government's case merely by applying for an NPDES permit and achieving the immunity conferred by Section 402(k), 33 U.S.C. 1342(k). It was this fear that prompted inclusion of the Refuse Act in the savings clause of Section 4(a), not any belief that the amendments would repeal or preempt the Refuse Act. Section 4(a) did not save pending Refuse

Act litigation from a supposed repeal of the Refuse Act; instead, § 4(a) saved pending Refuse Action litigation from the immunity possible under § 402(k), 33 U.S.C. 1342(k).[5] The court therefore cannot draw the negative inference argued for by OMC. Refuse Act prosecution has not been precluded by the 1972 Amendments.[6]

As a second line of attack on Count I, OMC argues that any injunctive remedy the Refuse Act might have afforded before 1972 has not survived the 1972 amendments. In particular, OMC urges that injunctive relief never was available under the Refuse Act itself, but only as a judge-made remedy; such a judge-made remedy, as a species of federal common law, must have been preempted by the 1972 amendments. *Milwaukee II.* In support of its position OMC relies on three cases: *United States v. Oswego Barge Corp.,* 664 F.2d 327 (2d Cir. 1981); *United States v. Dixie Carriers, Inc.,* 627 F.2d 736 (5th Cir. 1980); and *Steuart Transportation Co. v. Allied Towing Corp.,* 596 F.2d 609 (4th Cir. 1979).

Each of these cases involved an oil spill from a maritime vessel. Under Section 311(c) of the Clean Water Act, 33 U.S.C. § 1321(c), the United States may clean up oil spills and then recover its cleanup costs from the vessel owner. The same section limits the liability of the vessel owner. Section 311(f), 33 U.S.C. § 1321(f). In each of these cases the government cleaned up the oil spill and sought to recover its cleanup costs; however, the Government attempted to avoid the liability limitation of 33 U.S.C. § 1321(f) by suing as well under other theories, including the Refuse Act, which did not limit liability. Each court refused to permit additional recovery for cleanup costs under other theories, since such additional recovery would render meaningless the lim-

---

4. Section 511(b), 33 U.S.C. § 1371(b), does explicitly repeal the Supervisory Harbors Act of 1888 and the Rivers and Harbors Act of 1910, but not the Rivers and Harbors Act of 1899.

5. The legislative history confirms this reading. See footnote 3 and the citation therein.

6. To the extent Judge Wisdom's statement in *OMC II,* quoted above, suggests repeal of the Refuse Act, this court respectfully must disagree. It should be noted that the Court of Appeals was not considering the issue of the Refuse Act's continued vitality. The quoted passage was intended merely to demonstrate that Congress had considered the problem of pollutants in place before 1972.

ited liability provision of Section 311(f), 33 U.S.C. § 1321(f).

*Oswego, Dixie,* and *Steuart* do not control the present case, in which the Government seeks injunctive relief, not unlimited recovery of cleanup costs. Those cases denied recovery under the Refuse Act because of the clear and absolute clash between limited recovery under the Clean Water Act and unlimited recovery under the Refuse Act based on the same standard of liability. Injunctive relief under the Refuse Act does not present so clear or absolute a clash with the Clean Water Act. It is true that in some cases the costs of compliance with an injunction might exceed the liability limitation under the Clean Water Act, but the court does not understand OMC to be arguing that this is likely to occur in the present case. It should be noted that *Oswego* and *Steuart* expressly reserve the question of whether injunctive relief under the Refuse Act survives the 1972 amendments. 664 F.2d at 343 n. 24; 596 F.2d at 618 n. 16. *See also United States v. Oswego Barge Corp.,* 673 F.2d 47 (2d Cir. 1982) (on petition for rehearing). *Oswego* does, however, develop the theory that remedies under the Refuse Act are judge-made law, subject to preemption. 664 F.2d at 334–39.[7]

OMC's argument based on federal common law is appealing. In *Milwaukee II* the federal common law was revealed to be of a light and evanescent quality; it does not enjoy the benefits of the traditional presumption against implied repeal, but instead is presumed to vanish when Congress addresses the issue or speaks directly to the question. In the 1972 amendments, Congress spoke directly to the question of water pollution, and federal common law in this area is presumed to be preempted. 451 U.S. 304, 101 S.Ct. 1784 at 1790–92, 68 L.Ed.2d 114. OMC wishes to brand the Refuse Act injunction as federal common law, and there indeed is some basis for this characterization.

The Refuse Act was enacted as Section 13 of the Rivers and Harbors Act of 1899. Section 16, 33 U.S.C. § 411, prescribes fines of not more than $2500 and prison terms of not longer than one year for violations of the Refuse Act. No language anywhere in the Rivers and Harbors Act expressly authorizes injunctive relief for violations of the Refuse Act. One Court of Appeals decision explicitly held that the Refuse Act does not authorize injunctions, but that apart from the Refuse Act federal courts have inherent equity power to enjoin obstructions to navigation. *United States v. Bigan,* 274 F.2d 729, 732–33 (3d Cir. 1960). *Bigan* might indicate that the Refuse Act injunction had its origins in the federal common law, but subsequent cases suggest otherwise.

Three months after *Bigan* the Supreme Court decided *United States v. Republic Steel Corp.,* 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960), which, though not truly a Refuse Act case, looms large in this area. In *Republic Steel,* the Court held that an injunction could issue for the removal of pollutants from a river, where the accumulated bulk of the pollutants threatened to obstruct navigation. Although the discharge of the pollutants was a violation of the Refuse Act, the injunction actually was issued to enforce Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, which is concerned with obstacles to navigation. Section 12, 33 U.S.C. § 406, authorizes orders to remove only "structures" which violate Section 10, but the Court held that Congress had "provided enough federal law in § 10 from which appropriate remedies may be fashioned even though they rest on inferences." *Id.* at 492, 80 S.Ct. at 890. In 1967, the Supreme Court decided *Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). The Government brought this case under Section 15 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 409, which prohibits the intentional or negligent sinking of vessels in navigable

---

**7.** *Oswego* actually suggests that judge-made Refuse Act remedies are somewhat less susceptible to preemption than pure federal common law, since they were developed in aid of a statute. 664 F.2d at 338.

waters. Although injunctions for removal of sunken vessels are not provided for expressly under Section 15, the Court, relying heavily on *Republic Steel,* read that section to imply the availability of the injunctive remedy.

Several courts have relied on *Republic Steel* and *Wyandotte* for the availability of injunctive enforcement of the Refuse Act, apparently taking the cases as stating a principle of construction for the entire Rivers and Harbors Act of 1899. *Connecticut Action Now, Inc. v. Roberts Plating Co.,* 457 F.2d 81, 88 (2d Cir. 1972) (dictum); *United States v. Ira S. Bushey & Sons, Inc.,* 363 F.Supp. 110, 120 (D.Vt.), *aff'd,* 487 F.2d 1393 (2d Cir. 1973), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3182, 41 L.Ed.2d 1146 (1974); *United States v. Consolidation Coal Co.,* 354 F.Supp. 173 (N.D.W.Va.1973); *United States v. Armco Steel Corp.,* 333 F.Supp. 1073, 1076–77 (S.D.Tex.1971).[8] *Republic Steel* and *Wyandotte* clearly purport to be interpreting the language of the Rivers and Harbors Act of 1899; they do not claim to be fashioning federal common law. If they are credited on this point—and assuming that they govern Refuse Act cases—then the Refuse Act injunction falls outside *Milwaukee II,* for there is no suggestion in that case that the easy preemption applicable to the federal common law also applies to the case law interpretation of a federal statute. Of course, the distinction between federal common law and judicial interpretation of a federal statute may not be very clear. Even if the distinction is clear, a cynical reading of *Republic Steel* and *Wyandotte* might well conclude that the Supreme Court in those cases really was creating its own law rather than interpreting an act of Congress.

■ In the present case it proves unimportant whether the Refuse Act injunction is a creature of federal common law or whether it really derives from the Refuse Act. It is presumed that federal common law is preempted when Congress speaks directly to the question, but this is only a presumption. *Milwaukee II,* 101 S.Ct. at 1790–800. However the Refuse Act injunction is characterized, the court is convinced that Congress intended to preserve this remedy when it enacted the 1972 amendments. Section 511(a), 33 U.S.C. § 1371(a), demonstrates that the Rivers and Harbors Act of 1899 was intended to continue as a source of federal authority. Section 402(a) and (k), 33 U.S.C. § 1342(a), (k), refers specifically to the Refuse Act, providing that after 1972 the new NPDES permits shall be deemed to satisfy the permit provision of the Refuse Act. It is difficult to believe that Congress paid this attention to the Refuse Act in order to preserve the $2500 fine authorized by Section 16 or the one year imprisonment authorized by that section but apparently rarely or never used. The legislative history indicates that legislators were aware of major litigation under the Refuse Act, particularly the action to enjoin the Reserve Mining Company from continuing its operations.[9] The court cannot accept the suggestion that Congress intended to preserve the Refuse Act but to limit enforcement to the express terms of Section 16. Whatever the derivation of the Refuse Act injunction, the 1972 amendments were not intended to abolish it.

■ The court further concludes that all of the injunctive relief requested by the Government is available under Count I. While no case has been found in which a mandatory cleanup injunction issued under the Refuse Act itself, *Republic Steel* and *Wyandotte* granted such relief under other sections of the Rivers and Harbors Act of 1899. These authorities have been cited freely for the availability of injunctions under the Refuse Act, and they ought as well to govern the scope of injunctive relief available.

---

**8.** Two cases can be read as casting some doubt on the applicability of *Republic Steel* and *Wyandotte.* *United States v. Stoeco Homes, Inc.,* 498 F.2d 597 (3d Cir.1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397

(1975); *United States v. Florida Power & Light Co.,* 311 F.Supp. 1391, 1392 n. 1 (S.D.Fla.1970).

**9.** *See* footnote 3 above.

## Count II—The Clean Water Act

OMC also asks the court to dismiss Count II (the Clean Water Act count) and that portion of the prayer requesting injunctive relief. OMC has not asked the court to dismiss the request for civil penalties under the Clean Water Act, nor do its memoranda in support of this motion advance any reason why civil penalties should not be available under Count II. The court therefore will treat OMC's motion as OMC has treated it—not as a motion to dismiss Count II in its entirety for failure to state a claim under the Clean Water Act, but instead as a motion for a ruling that the injunctive relief sought is not available under the Clean Water Act based on the Government's allegations in Count II.

The allegations of Count II recite, *inter alia,* that OMC owns and operates the Johnson Outboard Division facility in Waukegan, and that it discharges wastewaters into the North Ditch, the Waukegan Harbor, and Lake Michigan. It is alleged that OMC used in its operations a hydraulic fluid containing PCBs; that leaks and spills of this hydraulic fluid were routed to OMC's wastewater collection; and that OMC's discharges of wastewater thus carried PCBs into the North Ditch, the Waukegan Harbor, and Lake Michigan, in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The discharges further are alleged to have contaminated sediments in those bodies of water as well as the groundwater underlying and adjacent to OMC's facility and portions of the soil on OMC's facility. This contamination is alleged to be "at levels which have harmed, and unless abated, will continue to harm the environment, and which pose a threat to the public health and welfare." The Government seeks penalties under § 309(d)

of the Clean Water Act, 33 U.S.C. § 1319(d), and under § 309(b) of the Act, 33 U.S.C. § 1319(b), which authorizes civil actions "for appropriate relief, including a permanent or temporary injunction . . . ," it seeks the same injunctive relief sought under Count I, the Refuse Act count.[10]

OMC's memoranda in support of its motion, as noted above, do not dispute that the Government has alleged a violation of the Clean Water Act. OMC instead argues that the authority to seek injunctive relief given by § 309(b) of the Act, 33 U.S.C. 1319(b), does not extend to the relief sought here. The thrust of OMC's argument runs as follows. Other provisions of the Clean Water Act are addressed specifically to the problem of cleaning up in-place pollutants. Section 115 of the Act, 33 U.S.C. § 1265, authorizes the Government to spend up to $15,-000,000 to remove in-place pollutants in critical port and harbor areas. Section 311, 33 U.S.C. § 1321, authorizes the Government to clean up certain discharges pursuant to a detailed regulatory plan and then recover cleanup costs from the polluter. In the face of these detailed, specific provisions, OMC argues, courts should not use the general enforcement provisions of Section 309(b) to fashion new cleanup remedies. OMC also points to the detailed cleanup provisions of the more recent CERCLA or Superfund, 42 U.S.C. §§ 9601 et seq., to show that Congress has addressed the problem of cleaning up pollutants.

The Government in response distinguishes between cleanup and recovery by the Government on the one hand, and on the other hand a mandatory injunction requiring a polluter to clean up in-place pollutants. The Government argues that while the provisions pointed to by OMC do treat

---

10. The Second Amended Complaint alleges discharges beginning in 1959. It appears to be common ground among all the parties that the Clean Water Act does not create liability for pre-1972 discharges. *OMC II* at 477; *see also* the briefs before the Court of Appeals on that case, Brief of the United States as *amicus curiae* at 6–12, Brief of Respondent People of the State of Illinois at 7. The Government's request that OMC be ordered to dredge the Har-

bor and the North Ditch, if granted, would remedy pre-1972 discharges as well as post-1972 discharges. It may be that relief for pre-1972 discharges will be available under another count of the complaint. If not, the admixture of pre-1972 and post-1972 discharges would be a problem of fashioning appropriate relief. The court does not consider this problem important on OMC's motion to dismiss.

the narrower question of government cleanup and recovery, they do not purport to be the sole answer to the broader question of cleanup remedies in general, and thus do not preclude courts from issuing cleanup injunctions to polluters under Section 309(b).

The court questions first of all whether it is appropriate to speak of all the requested injunctive relief as "cleanup" relief, as the parties have done. Much of the requested relief is directed not at past but at future discharges. The North Ditch bypass system is directed at future discharges. PCBs in OMC's soil and groundwater have not yet been discharged, 33 U.S.C. § 1362(12), so their removal would prevent future violations. OMC's argument seems weakest as applied to these future-oriented measures.

Even as to dredging of the Harbor and North Ditch, OMC's argument fails to convince the court. OMC relies heavily on *Milwaukee II* and *OMC II,* cases which dealt with the preemptive effect of the 1972 amendments upon federal common law. These cases do not govern interpretation of Section 309, nor do they provide useful analogies; at most they counsel the court against embellishing the remedies Congress has provided. Here Congress has provided a detailed cleanup and recovery scheme in Section 311 and has authorized actions for injunctive relief under 309(b). These statutory provisions are not irreconcilable, and the court will not strain to find conflicts between them.

OMC argues that granting relief under Section 309(b) involves an end run around the detailed requirements of Section 311, but in the present case, at least, there seems to be no injury to the policies behind Section 311. OMC has not argued that the cost of complying with the requested injunctions would be likely to exceed its $50,-000,000 liability limitation under Section 311(f). Other goals of Section 311—prompt response to environmental crises and holding responsible those who pollute navigable waters—are not harmed by reading Section 309(b) as authorizing the relief requested here.

Section 115, 33 U.S.C. § 1265, likewise does not govern the court's reading of Section 309(b). Section 115 authorizes the Government to locate and remove in-place pollutants at its own expense, but there is no reason to treat this brief provision as the sole basis for removal of accumulated pollutants.

■ The question remains whether, even apart from considerations of Section 311 and 115, the requested relief is available under Section 309(b). The Government offers three cases in which mandatory injunctive relief issued, apparently under Section 309(b). In *United States v. Weisman,* 489 F.Supp. 1331 (M.D.Fla.1980), and *Parkview Corporation v. Department of the Army,* 490 F.Supp. 1278 (E.D.Wis.1980), defendants were ordered to remove fill roads from wetlands. In *O'Leary v. Moyer's Landfill,* 523 F.Supp. 642 (E.D.Pa.1981), the defendant was ordered to repair a collection system. A fourth case granting mandatory injunctive relief is *United States v. City of Detroit,* 476 F.Supp. 512 (E.D.Mich.1979). In all these cases the positive injunctive relief granted was designed mainly to avoid future violations or to abate continuing violations. Such relief clearly is contemplated by Section 309(b): the court "shall have jurisdiction to restrain such violations and to require compliance." As noted above, much of the requested relief is future-oriented and would be available under these precedents.

It is less clear that Section 309(b) provides a basis for an order that OMC remedy past discharges by removing sediments from the Harbor and the North Ditch. The court has found no case in which such relief was granted under Section 309(b). One might doubt that the court's jurisdiction "to restrain such violation and to require compliance" includes the power to order cleanup of past discharges. On balance, however, the court believes that such a cleanup remedy fairly can be found within the language of Section 309(b). The Administrator is authorized to seek "appropriate relief, including a permanent or temporary injunction, for any violation for which he is autho-

rized to issue a compliance order." This language is broad enough to include clean-up orders.

The court holds that all of the injunctive relief requested by the Government is available under both Count I and Count II of the Second Amended Complaint, and OMC's motion to dismiss therefore is denied.

It is so ordered.