**UNITED STATES of America,
Plaintiff,**

v.

**ALCOA INC., Defendants.**

**No. 4:99CV61AS.**

United States District Court,
N.D. Indiana,
South Bend Division.

May 26, 2000.

Clifford D. Johnson, United States Attorney's Office, South Bend, IN, Joseph Williams, United States Environmental Protection Agency, Office of Regional Counsel, Chicago, IL, Lois J. Schiffer, Francis J. Biros, David S. Christensen, Stacey H. O'Bryan, United States Department of Justice, Environmental Enforcement Section, Washington, DC, for Plaintiff.

Anthony S. Benton, Susan K. Roberts, William P. Kealey, Stuart and Branigin, Lafayette, IN, Diane W. Whitney, Ronald W. Zdrojeski, Lee D. Hoffman, James A. Thompson, LeBoeuf Lamb Greene and MacRae, Hartford, CT, Barry M. Hartman, Lance W. High, Kirkpatrick and Lockhart, Washington, DC, Richard W. Hosking, Paul K. Stockman, Kirkpatrick and Lockhart, Pittsburgh, PA, for Defendants.

### MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This cause is before the Court on Alcoa Inc.'s Motion to Dismiss, or in the Alterna-

tive, Motion to Strike dated August 20, 1999. Alcoa Inc. ("Alcoa") moves for dismissal of all counts related to the third paragraph of the Prayer for Relief in the Complaint filed by the Plaintiff United States of America for failure to state a claim for which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). Alternatively, Alcoa moves this Court to strike the third paragraph of Plaintiff's Prayer for Relief pursuant to Fed.R.Civ.P. 12(f) because allegedly there is no legal basis to support that request. The third paragraph in the Plaintiff's Prayer for Relief requests that the Court "Order Defendant to develop and carry out a plan, subject to approval by the EPA, for appropriate remediation of contaminated sediments in the Elliot Ditch/Wea Creek watershed." The Plaintiff has also requested additional injunctive relief and civil penalties which could be in excess of ten million dollars. The only issue before the Court at this time is whether, as a matter of law, sediment remediation is an available remedy under Section 309(b) of the Clean Water Act. 33 U.S.C. § 1319(b). At a pretrial conference on January 14, 2000, the parties were given the opportunity to argue their motions. They were also allowed to submit unlimited supplemental briefs for the purpose of fully informing the Court on this issue. The Court has considered all the submissions of the parties, and for the reasons set out below, the Defendant's Motion to Dismiss for Failure to State a Claim is hereby **DENIED**.

## I. BACKGROUND

In the process of producing aluminum ingots and other aluminum products, Alcoa, Inc. discharges a number of regulated substances from its Lafayette, Indiana facility into Elliot Ditch. The Ditch flows into Wea Creek, and ultimately into the Wabash River. These discharges are covered by a National Pollutant Discharge Elimination System (NPDES) permit which Alcoa received in 1985, and which authorizes the discharges with strict limits for certain pollutants. Alcoa is required to monitor its effluent discharges daily and report the results to the Indiana Department of Environmental Management (IDEM). Alcoa has exceeded its authorized discharge limitations on numerous occasions. Based on Alcoa's monthly Discharge Monitoring Reports (DMR's), the Lafayette plant exceeded its daily effluent discharge limits for a total of at least 408 separate violations between 1993 and 1999, and it continues to do so. (Compl. at ¶ 48). Each day a facility exceeds an effluent limit constitutes a separate violation and subjects Alcoa to fines of up to $25,000 per day for discharges before January 31, 1997, and $27,500 per day for discharges after that date. (Id. at ¶ 49 citing 33 U.S.C. § 1319(d)).

The Government alleges that Alcoa's discharge violations have contaminated the sediments in Elliot Ditch and Wea Creek to such an extent that these sediments now present a persistent and ongoing risk of harm to human health and the environment. The Government is most concerned about the presence of Polychlorinated Biphenyls (PCBs), which even at low levels may result in acute and chronic toxicity to human health and the environment. Indiana State health officials have advised that fish taken from Elliot Ditch and Wea Creek should not be eaten because PCB concentrations found in fish samples from the area were above the United States Food and Drug Administration action levels for PCBs. (Compl. at ¶ 13). Alcoa's own sampling has consistently revealed significant levels of PCBs in the sediments and in fish found downstream of the facility in the Elliot Ditch/Wea Creek watershed. (Gov.'s Br. in Res. at 6.) In addition, the Government alleges that Alcoa is the only Facility that uses Elliot Ditch and Wea Creek for industrial discharges, making it the sole source of PCBs and other contaminants to the watershed.

Alcoa used PCBs in its manufacturing processes from the 1950s through at least the 1970s, and some residue remains in

equipment, buildings and soil. Alcoa's permit allows for the discharge of minute amounts of PCBs, but 63 test samples out of 2,049 taken since 1993 indicate an amount of PCBs in the effluent discharge in excess of the limit. PCBs absorb into organic sediments, resist breaking down, and tend to accumulate in greater amounts as they move upward through the food chain. (Gov.'s Br. in Res. at 6.)

Therefore, on June 11, 1999, the United States commenced this action against Alcoa for violating its NPDES permit pursuant to the Clean Water Act (CWA), FWPCA Section 402, 33 U.S.C. § 1319(b), in which it is seeking a variety of remedies. In addition to fines and an injunction that Alcoa comply with its permits, the Government has asked for an injunction requiring the Defendant to develop and carry out a plan, subject to approval by the EPA, for appropriate remediation of contaminated sediments in the Elliot Ditch/Wea Creek watershed. (Gov.'s Prayer for Relief at ¶ 3.) The Defendant challenges this remedy as unavailable under the statute in question and asks the Court to dismiss it under Fed.R.Civ.P. Rule 12(b)(6) for failure to state a claim, or in the alternative, to strike the third paragraph pursuant to Fed.R.Civ.P. Rule 12(f).[1]

## II. JURISDICTION

This cause of action arises under 33 U.S.C. § 1319(b), the enforcement provision of the Clean Water Act. The statute grants authority to United States district courts to grant appropriate relief, including a permanent or temporary injunction, to restrain violations and to require compliance.

## III. STANDARD OF REVIEW

To succeed on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the defen-

dant must prove that even assuming the plaintiff's allegations are true, the complaint fails to state a claim upon which relief can be granted. In reviewing a motion to dismiss, the court looks only at the legal sufficiency of the complaint and not the merits, *Triad Assoc., Inc. v. Chicago Housing Auth.*, 892 F.2d 583, 586 (7th Cir.1989), cert. denied, 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990), taking the plaintiff's factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Veazey v. Communications & Cable of Chicago, Inc.*, 194 F.3d 850, 853 (7th Cir.1999). This does not mean, however, that the court is required to accept legal conclusions that may be alleged in the complaint or that may be drawn from the pleaded facts. *Vaden v. Village of Maywood*, 809 F.2d 361, 363 (7th Cir.), *cert. denied*, 482 U.S. 908, 107 S.Ct. 2489, 96 L.Ed.2d 381, (1987); see also, *Milwaukee v. Saxbe*, 546 F.2d 693, 704 (7th Cir.1976). Dismissal is appropriate if it appears beyond doubt that no relief could be granted under any set of facts that could be proved in support of the plaintiff's claim. *Veazey*, 194 F.3d at 853, *citing Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

## IV. DISCUSSION

In 1972, Congress enacted the Clean Water Act (the "CWA"), for the stated purpose of restoring and maintaining the "chemical, physical and biological integrity of the nation's waters." FWPCA § 101(a); 33 U.S.C. § 1251(a). Congress declared it to be a national priority to clean up the nation's sadly polluted waterways and make them safe for fish, wildlife, and recreation in and on the water. It is now the "national policy" that the "discharge of toxic pollutants in toxic amounts" shall be

---

1. Rule 12(f) of the Federal Rules of Civil Procedure states that "the Court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The Defen-

dant asks the Court to strike a paragraph in the Plaintiff's Prayer for Relief that is not a defense, nor is it redundant, immaterial, impertinent, or scandalous. The Court therefore finds this Rule inapplicable.

prohibited. FWPCA § 101(a)(3); 33 U.S.C. § 1251(a)(3). Beginning with Section 301, the Act establishes a broad prohibition against "the discharge of any pollutant by any person" unless the discharge is in compliance with the Act's permit requirements, effluent limitations, and other enumerated provisions. FWPCA § 301(a); 33 U.S.C. § 1311(a).

Section 309(b) is the enforcement provision for violations of Section 402, which requires a permit for effluent discharges (an "NPDES Permit"), and § 404, which requires a permit for dredge and fill activities affecting navigable waters, including wetlands. FWPCA §§ 309(b), 402 and 404; 42 U.S.C. §§ 1319(b), 1342 and 1344. Section 309(b) gives the Administrator the authority to bring suit in federal district court for "appropriate relief, including a permanent or temporary injunction," and grants the district court "jurisdiction to restrain such violations and to require compliance." FWPCA § 309(b); 33 U.S.C. § 1319(b). The sole issue before the Court at this time is the scope of the court's discretion to fashion an equitable remedy under Section 309(b) of the Clean Water Act. The Government asserts that the jurisdictional language "to restrain such violations and to require compliance" is broad enough to encompass the remedy it seeks, an injunction ordering Alcoa to clean up sediments allegedly contaminated with PCBs as a direct result of Alcoa's violations of its NPDES Permits. The Government asserts that traditional concepts of a court's equitable discretion and the purposes of the Clean Water Act support its position. Alcoa vehemently objects to the Government's interpretation, arguing that rules of statutory construction and the legislative history of the Clean Water Act establish that the Government is not entitled to the relief it seeks.

Only one federal court has considered this issue, the Northern District of Illinois in 1982. *See United States v. Outboard Marine Corporation*, 549 F.Supp. 1036, 1043 (N.D.Ill.1982). In *Outboard Marine*, the court held that the Government could get the injunctive relief it sought under another statute, and dealt therefore in a cursory manner with the use of Section 309(b) for the clean up of in-place sediments.[2] However, in 1993, the EPA, relying in part on the ruling in *Outboard Marine Corporation*, included a section in its Sediment Enforcement/Remediation Training Workbook explaining that in certain situations, the EPA should be able to use Section 309(b) of the Clean Water Act to get an injunction mandating clean up of in-place contaminants. Since that time, the EPA has on several occasions sought sediment remediation for violation of the Clean Water Act. In response to a request by this Court at oral arguments, the Government submitted information on four cases where sediment clean up was sought under this provision, but all of these cases settled. (Gov.'s Supp.Br. at 22–5, n. 17.) In each case, however, defendants agreed to pay for sediment remediation as part of their Consent Decree. Remediation was a component of injunctive relief issued for the purpose of redressing "the effects of prior unlawful discharges in violation of the CWA." (Id.) However, because these cases were resolved through settlements,

---

**2.** United States v. Outboard Marine Corporation, 549 F.Supp. 1036 (N.D.Ill.1982). The court's entire analysis of the in-place sediment remediation issue was as follows:

It is less clear that Section 309(b) provides a basis for an order that OMC remedy past discharges by removing sediments from the Harbor and the North Ditch. The court has found no case in which such relief was granted under Section 309(b). One might doubt that the court's jurisdiction "to restrain such violation and to require compli-

ance" includes the power to order cleanup of past discharges. On balance, however, the court believes that such a cleanup remedy fairly can be found within the language of Section 309(b). The Administrator is authorized to seek "appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order." This language is broad enough to include "cleanup orders."

*Id.* at 1043.

the courts did not rule on the issue of the scope of their authority to award sediment remediation under Section 309(b). °

In 1998, the EPA published a document entitled "EPA's Contaminated Sediment Management Strategy," in which it again assessed using Section 309(b) to obtain an injunction for mandatory sediment remediation. This publication states that Section 309(b) is the appropriate provision of the CWA for the removal of illegally discharged pollutants where a link can be established between the unlawful discharge and the contaminated sediment. It suggests that where the link is not well established, creative solutions are possible that encourage polluters to undertake sediment pollution removal in lieu of civil penalties. The document also contrasts Section 309(b) with Section 504, stating that an enforcement action can be brought under Section 504[3] to compel responsible parties to clean up contaminated sediments, even if the polluter was in compliance with its permit requirements, where the polluted sediments present an "imminent and substantial endangerment" to human health or the environment. The Government submitted these documents with its Brief in Response as Exhibits C and D, therefore the Court assumes that they represent the agency's interpretation of Section 309(b) of the Clean Water Act and its interplay with Section 504.

The first issue the Court must resolve is the degree of deference the Court must show to the EPA's interpretation of the statute it administers. The Supreme Court addressed this issue in *Chevron*

*U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), where it held that "a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute." *Christensen v. Harris County,* —— U.S. ——, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000). Chevron deference has also been applied to adjudicative proceedings. *City of Chicago v. FCC*, 199 F.3d 424, 429 (7th Cir.1999). However, the Supreme Court just recently fractured over the degree of deference that must be given to agency opinions that have not gone through a formal adjudication or notice-and-comment rulemaking. *Christensen,* —— U.S. ——, 120 S.Ct. at 1662, 146 L.Ed.2d 621. The Court stated that under Chevron, an agency's interpretation of the statute it administers must be upheld unless Congress has spoken clearly to the contrary, or the agency's interpretation is unreasonable. *Id.* Then Justice Thomas, writing for a four justice plurality, stated that "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference." *Id.* The Court concluded that agency interpretations are still "entitled to respect," but only to the extent that those interpretations have the "power to persuade." *Id.* Justice Scalia, in a concurrence, would have given Chevron-style deference to agency opinions even when not developed through a formal rulemaking or adjudication. This seems to be the opinion of the

---

**3.** Alcoa alleges that the EPA is trying to use Section 309(b) for sediment remediation instead of Section 504, which requires an imminent and substantial endangerment, because it cannot meet the higher standard in that and other statutes available for clean up of in-place sediments. This argument fails because the threshold for finding an imminent and substantial endangerment is quite low. *See Environmental Law Handbook* (Thomas F.P. Sullivan ed., 14th ed.1997) at 459 (stating that courts that have had very little difficulty finding that such an endangerment exists since

the standard necessary to establish an imminent and substantial endangerment is minimal). In cases under CERCLA Section 106, courts have construed "imminent" to mean that the harm does not have to be immediate, but could arise in the future if the problem is not abated. *Id.* Similarly, endangerment has been construed to mean not actual harm, but only the threat of a potential harm. *Id.* "It is therefore difficult to imagine a situation with a release or threatened release without there also being an imminent and substantial endangerment." *Id.*

three justices who dissented as well, and Justice Souter wrote a separate concurrence to say that nothing in the opinion prevented the Labor Department from adopting the challenged opinion as a regulation, which would entitle it to greater deference.

■ Applying the narrowest holding from *Christensen*, this Court concludes that the EPA's interpretation of Section 309(b) is not the product of a formal rulemaking or adjudication process, therefore it falls in the same category with opinion letters, policy statements, agency manuals, and enforcement guidelines. It is entitled to some deference, but only to the extent that it is a persuasive interpretation of the statute.

■ To determine if the EPA's interpretation is persuasive, the Court decide what Congress meant by the language of Section 309(b). Where a statute is clear and unambiguous on its face, it should be enforced according to the terms outlined. *Patterson v. Shumate*, 504 U.S. 753, 759, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). The problem with Section 309(b) is that it is not clear and unambiguous on its face. It first has language granting broad authority to the Administrator "to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order under subsection (a) of this section." FWPCA § 309(b); 33 U.S.C. § 1319(b). The Government points out, and Alcoa does not disagree, that this sentence seems to indicate the Administrator has available the full range of traditional injunctive relief. But the next sentence seems to limit the injunctive relief available when it says that federal courts shall have jurisdiction "to restrain such violation and to require compliance." Id. It is the interpretation of this second sentence, and its relationship to the first, that gives rise to the current controversy.

The Government argues that these two passages should be read together and in conjunction with the holding in *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) to support its position that the court may exercise the full extent of equitable authority traditionally available to courts of equity. The Government suggests that Alcoa's reading of the statute is "constricted" and would require the addition of the words "only" and "future" to obtain their meaning. The Court disagrees

[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.

*Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 13, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

In Section 309, Congress provided specific remedies for violations of NPDES permits. The Administrator is authorized to issue a compliance order or seek appropriate relief in a civil action, including a permanent or temporary injunction (b). The Administrator may also seek criminal penalties (c); civil penalties (d); or assess administrative penalties (g). Equitable relief under (b) is limited by the jurisdictional statement to injunctions for the purpose of restraining violations and requiring compliance. Fines are not limited by the jurisdictional statement in (b) but are instead covered by (d). The Government's interpretation of Section 309(b) as providing authority for all of the court's traditional equitable remedies is not persuasive. The Court concludes that the granting language of the first sentence is limited by the jurisdictional language of the second sentence, and that this Court's authority under Section 309(b) is limited to issuing injunctions to restrain violations or to require compliance.

The Government has a second argument which is more persuasive. It argues that the remedy it seeks, sediment remediation, is nevertheless available under the language of the statute. The Government backs its argument with cases in which courts have ordered restoration of natural resources as a means of "enforcing compliance." *See United States v. Cumberland Farms*, 647 F.Supp. at 1166 (D.Mass.1986); *United States v. Lambert*, 589 F.Supp. 366 (M.D.Fla.1984); *United States v. Bradshaw*, 541 F.Supp. 884, 886 (D.Md.1982); and *United States v. Carter*, 18 ERC 1810 (S.D.Fla.1982). Although, as the Government points out, these cases all involved the illegal filling of wetlands, rather than the violation of NPDES Permits, the Government argues that they are directly analogous to the situation at issue in this case. (Gov.'s Supp.Br. at 18). In the permit process, the issuing agency considers the amount of each listed substance produced by the applicant that can safely be released in the applicant's effluent discharge without causing harm to human health or the environment. Any exceedence, therefore, is considered to be harmful. The harm is compounded by the fact that some permitted substances do not naturally break down in the environment, but instead settle into the sediments and from there, continue to be released into the water. The Government argues that this secondary release is a continuing violation of the polluter's NPDES Permit, and therefore is a violation of the Clean Water Act. The Government asserts that the language "to require compliance" is broad enough to cover this kind of continuing violation where an entity has exceeded its NPDES permits, and where the exceedences have caused sediment contamination which continues to affect the quality of the water and limit its uses. The Government also cites *United States v. Outboard Marine Corp.*, 549 F.Supp. 1036 (N.D.Ill. 1982), to support its position. In *Outboard Marine*, the court came to this same conclusion, although its determination is not binding precedent on this Court.

In addition, the Government suggests that the fundamental purpose of the Act, "to *restore* and maintain the chemical, physical and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a) (emphasis added), should be considered when interpreting Section 309(b). According to the Government, it is necessary to interpret the phrase "to require compliance" broadly in order effectuate the Congressional purpose of restoring the integrity of the Nation's waters.

Alcoa argues that the restorations ordered in wetlands permit violations do not apply to violations of NPDES Permits under Section 402. Section 404 requires anyone planning to discharge dredged or fill material into "navigable waters of the United States" to get a permit from the Army Corps of Engineers. "Navigable waters" has been interpreted to include wetlands. Violation of this provision is frequently remedied by ordering the culprit to physically remove the fill material and restore the land to its natural condition. (Alcoa's Supp.Mem. at 10.) Alcoa alleges that violation of an NPDES Permit is distinguishable both factually and legally from a wetlands case because as long as the fill material remains in the wetland, the violation continues unless the responsible party gets a permit. (Id.) Therefore, "an order requiring removal of improperly-deposited fill is an order compelling compliance with the Clean Water Act, an injunction expressly permitted by Section 309(b)." (Id.) On the other hand, Alcoa asserts that injunctions requiring compliance in the context of an NPDES permit violation must relate to the NPDES requirements and to the act of discharge itself. Once the discharge is complete, according to Alcoa, the violation is complete and nothing can be done under Section 309 about the pollutants illegally dumped into the water. Alcoa argues that Section 309 can only be used to fine the company for its past bad behavior and to require it to comply with its permit limitations in the future, for example, by making

changes in its wastewater treatment process that would eliminate the violations.

Faced with a statute which is capable of two reasonable interpretations, courts often look to the legislative history to aid in determining what Congress intended by the language. Both the Government and Alcoa have mustered considerable support from the legislative record, and subsequent attempts at amendment, to support their opposing interpretations. After carefully considering the submissions, the Court concludes that the legislative history does not cast any additional illumination on the meaning of the words "require compliance." Alcoa's strongest argument is the fact that a clarifying amendment was defeated that would have specifically granted the remedy the Government is requesting, but this fact is countered by the Senate Report which stated that the purpose of the bill was to clarify the issue, not to expand the scope of existing authority. S.Rep. 103–527, at 185 (1994). The failure of Congress to pass this amendment could mean that a majority of legislators thought the amendment was unnecessary because the federal courts already had this authority, or it could mean that they did not want the federal courts to have this authority. The legislative history is inconclusive. The Court must look elsewhere for assistance in interpreting this statute.

Both sides have made policy arguments to strengthen their positions. The Government is concerned that Alcoa, the party it believes to be responsible for contaminating Elliot Ditch and Wea Creek, will somehow escape liability for cleaning it up. Alcoa is concerned that allowing the Government to get an injunction mandating sediment remediation for violation of an NPDES permit could create a situation where the remedy is far out of proportion to the violation. It claims this would be the case if it has to dredge miles of river sediments to remove PCBs for exceeding its NPDES Permit for PCBs 63 times, when it has complied with its effluent limitations 98 percent of the time. (Alcoa's

Supp.Mem. at 1.) In addition, allowing broad injunctive relief under Section 309(b) for clean up of in-place sediments would allow the Government to bypass the safeguards built into CERCLA, which Congress passed specifically to deal with the effects of past pollution and in-place contamination. However, the Government does not suggest that requiring sediment remediation would be an appropriate remedy for every violation of an NPDES Permit, only for instances where illegally discharged pollutants persist in sediments and create an ongoing threat of harm to human health and the environment. (Gov.'s Supp.Br. at 4, n. 2.) The Government alleges that this is an appropriate case to order remediation because the serious health hazard posed by PCBs and their persistence in the environment, and because of the strong connection between Alcoa's permit violations and the continual release of PCBs from the sediments into the waters of Elliot Ditch and Wea Creek.

It seems appropriate at this point to note that the company in *Outboard Marine* responsible for contaminating the harbor with PCBs eventually had to pay for sediment remediation, but it managed through legal maneuvering to postpone the inevitable for many years. *United States v. Outboard Marine Corporation,* 789 F.2d 497, 500 (7th Cir.1986); *see also* Erin White, Realizing Remediation: a Summary of Contaminated Sediment Remediation Activities in the Great Lakes Basin (1998) at 9–10. The Government began civil proceedings against Outboard Marine Corporation (OMC) in 1978 because of the high level of PCBs found in Waukegan Harbor near its plant. Id. It was estimated that nearly one million pounds of PCBs were present on OMC property and in the sediments of the Harbor. White, *supra* at 9. It took until 1989 for the EPA to complete the CERCLA process and enter a Consent Decree that required OMC to place money in a trust fund to clean up the harbor. Id. The remedial work was not completed until 1992. Id. at 10. Monitoring indicates

that fish tissue contaminant concentrations in the harbor continue to decrease. Id. Warning signs from within the harbor have been removed because sampling has recently shown declines in concentrations to the same levels as the greater Lake Michigan area. Id. Compliance monitoring continues to show the remedy is meeting its objectives. Id. Total Cost for the remediation effort was estimated to be twenty-one million dollars. Id.

 In balancing the equities, the Court finds that they weigh in favor of allowing the Government to proceed with its claim for sediment remediation under Section 309(b). Alcoa has not convinced the Court that Congress intended the same language in Section 309(b) to provide two different remedies, depending on whether an injunction is addressing violations under Section 402 or Section 404. Therefore, the Court concludes that the court's authority to grant an injunction "to require compliance" in Section 309(b) is broad enough to include the mandated clean up of contaminated sediments where the sediments are contaminated as a direct result of NPDES Permit violations. However, for an injunction to issue for sediment remediation under Section 309(b), the EPA must first establish that the sediments are contaminated with a substance that was released by the Defendant in an amount in excess of its NPDES Permit. In addition, it must show that the substance is hazardous to human health and the environment; that it will not naturally break down over time; and that it will continue to be released into the "waters of the United States" at such a level as to contaminate the water and make it unsafe for its designated uses. Finally, since this Court is being asked to use its equitable powers, there must be a rough proportionality between the Defendant's permit violations and the relief the Government is seeking. If the Government can prove its allegations that Alcoa is the only source of PCB contamination in Elliot Ditch and Wea Creek, and that it has exceeded its permit limitations for

PCBs sixty-three times and counting, the proportionality requirement is probably met.

## V. CONCLUSION

For the preceding reasons, Alcoa's Motion to Dismiss for Failure to State a Claim under Fed.R.Civ.P. 12(b)(6) is hereby **DENIED.**

**IT IS SO ORDERED.**